UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DAVID LITTLEFIELD, MICHELLE LITTLEFIELD,
TRACY ACORD, DEBORAH CANARY, FRANCIS
CANARY, JR., VERONICA CASEY, PATRICIA
COLBERT, VIVIAN COURCY, WILL COURCY,
DONNA DeFARIA, ANTONIO DeFARIA, KIM
DORSEY, KELLY DORSEY, FRANCIS LAGACE,
JILL LAGACE, DAVID LEWRY, MICHELE LEWRY,
RICHARD LEWRY, ROBERT LINCOLN,
CHRISTINA McMAHON, CAROL MURPHY,
DOROTHY PEIRCE, DAVID PURDY and LOUISE
SILVIA,

                                    Plaintiffs,

                    v.

UNITED STATES DEPARTMENT OF THE
INTERIOR, 1849 C Street, N.W., Washington, C 20240,
SALLY JEWELL, in her official capacity as Secretary,
U.S. Department of the Interior, 1849 C Street, N.W.,
Washington, DC 20240, BUREAU OF INDIAN
AFFAIRS, U.S. Department of the Interior, 1849 C
Street, N.W., Washington, DC 20240,
LAWRENCE ROBERTS, in his official capacity as
Acting Assistant Secretary – Indian Affairs, U.S.
Department of the Interior, 1849 C Street, N.W.,
Washington , DC 20240, UNITED STATES OF
AMERICA.

                                    Defendants.

Civil Action No.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

## NATURE OF THE ACTION

### Challenge to Record of Decision Taking Lands into Trust
### for Benefit of the Mashpee Wampanoag Tribe

1.      The action is brought to overturn the unprecedented and unlawful decision of the

Secretary of the Interior (the "Secretary") to take into trust, for the benefit of the Mashpee

Wampanoag Tribe ("Mashpees"), 151 acres of land located in the City of Taunton, Bristol

County, Commonwealth of Massachusetts, and declare that land eligible for gaming under the Indian Gaming Regulatory Act (IGRA).  The Secretary's decision is set forth in a Record of Decision dated September 18, 2015 (ROD).  A copy of the ROD is attached as an Exhibit.[1]

2.     The purpose of the ROD is to remove forever the land, currently held in fee simple by the Mashpees, from the tax and regulatory jurisdiction of the Commonwealth of Massachusetts, the County of Bristol, and the City of Taunton, and in the process create a tax-immune, regulation-free Indian reservation on which the Tribe is authorized to build and operate a Las Vegas-style casino resort called "First Light," complete with a 15 to 17 story high main building, three hotels and parking for 6,000 vehicles.  The main tower building, if constructed, will be the tallest structure for miles around, purportedly able to catch the sun's first rays and light up the night sky—a highly visible intrusion, day and night, 24 hours a day, 365 days a year.

3.     The "First Light" destination resort casino will dominate the residential East Taunton neighborhood in which it will be located—*if* the land acquisition under the Indian Reorganization Act of 1934 (IRA) is allowed to stand. The proposed $500 million development is testament to the ambitions of the Mashpees and their Malaysian business partners (Genting Group), all responding to the economic incentives created by IGRA.

4.     This community-altering casino development can legally happen only if the Secretary of the Interior possesses authority under the IRA to take into trust the lands in question in Taunton.

5.     This lawsuit presents an inconvenient truth: The Secretary of the Interior lacks the statutory authority to take lands into trust for the Mashpees, who were not a federally recognized

---

[1] Plaintiffs are residents of Taunton who are directly impacted by any development of the 151 acre parcel in Taunton.  The September 18, 2015 decision by the Secretary also took into trust 170 acres in the Town of Mashpee, Barnstable County, about 50 miles away. Plaintiffs seek to overturn the ROD on the ground that the Secretary lacks statutory authority to take into trust any lands for the Mashpees. The present lawsuit therefore affects parcels in the Town of Mashpee as well as in Taunton.

tribe under federal jurisdiction in 1934 (they were first federally recognized in 2007), and thus are ineligible under the Supreme Court's decision in *Carcieri v Salazar,* 555 U.S. 379 (2009). That Supreme Court decision, involving the Narragansett Tribe in Rhode Island, expressly limits IRA benefits, including its land acquisition provisions, to federally recognized tribes that were under federal jurisdiction in 1934. The *Carcieri* ruling prohibits the Secretary from acquiring lands for eastern tribes, like the Narragansetts and Mashpees, who were exclusively under state jurisdiction.

6.      Section 479 of the IRA defines who qualifies as an eligible "Indian" and presents three classes or categories of eligibility:

> The term "Indian" as used in the Act shall include (1) all persons of Indian descent who are members of any recognized tribe now under Federal jurisdiction; (2) and all persons who are descendants of *such members* who were, on June 1, 1934, residing within the present boundaries of any Indian reservation, and (3) shall further include all other persons of one-half or more Indian blood.

25 U.S.C. § 479 (emphasis added).

7.      The first category of who is an "Indian"—with its express temporal limitation of "now under Federal jurisdiction"—was construed in *Carcieri.* The high court held that Congress, when it passed the IRA in 1934, meant "now" to mean 1934. Thus, only federally recognized tribes under federal jurisdiction in 1934 are eligible to receive IRA benefits and services, including fee-to-trust land acquisitions under Section 465.

8.      The Department of the Interior believes the Supreme Court's decision in *Carcieri* was wrongly decided, having advocated before the Supreme Court that "now" meant "now or hereafter." The Secretary believes the IRA gives it the authority to take lands into trust for any recognized tribe, provided that tribe is federally recognized and under federal jurisdiction at the time of the decision to take the land into trust. The Department of the Interior has spearheaded

efforts in Congress to overturn the Supreme Court's decision in *Carcieri*. Those efforts have failed.

9.     The Department of the Interior has also undertaken efforts, in its administrative implementation of the IRA, to work around the *Carcieri* decision by broadly interpreting the phrase "now under Federal jurisdiction" contained in the first definition of "Indian" under IRA.[2] That administrative work-around does not impact this case, which involves the second definition of "Indian" under the IRA.

10.     To circumvent the restrictions in *Carcieri,* but unable to fit the Mashpees under the first definition of "Indian" even as liberally construed by the Department, the Secretary creates for the first time here an unprecedented, ungrammatical and illogical reading as to who is an eligible "Indian" and what is a "reservation" under the IRA.

<u>Unprecedented Reading of "Indian"</u>

11.     The ROD is the first land-into-trust decision in which the Secretary relied on the second definition of "Indian" under the IRA. In every other land-into-trust decision, the Secretary has relied on the first definition.

12.     The Secretary in the ROD altogether shuns the first category of who is an "Indian" under the IRA. The Secretary did so knowing that the Mashpees, like the Narragansett Tribe in Rhode Island, were under state jurisdiction throughout their history and therefore cannot meet the definition of a federally-recognized tribe under federal jurisdiction in 1934. Instead, the Secretary purports to root her authority to acquire lands for the Mashpees in the second definition of "Indian" under the IRA, namely: "all persons who are descendants of such

---

[2]     *See Confederated Tribes of the Grand Ronde Community of Oregon v. Sally Jewell*, Case No. 14-5326 (D.C. Circuit).

members who were, on June 1, 1934, residing within the present boundaries of any Indian

reservation."

13.     The second definition of "Indian" is clear on its face.  A plain reading of the

unambiguous text refutes the Secretary's reading.  The demonstrative adjective "such" before

"members" naturally and necessarily refers to the antecedent phrase "members of any recognized

tribe now under Federal jurisdiction" in category one.  That reading is required by the plain

language employed by Congress, and is bolstered by the canons of statutory construction,

including the "last antecedent" rule.  The last antecedent rule necessarily pulls in the *entire*

*antecedent clause* (*i.e.* "members of any recognized tribe now under Federal jurisdiction") into

category two.

14.     A straight-forward reading of the plain text leads to only one rational conclusion:

"such members" means the "members of any recognized tribe now under Federal jurisdiction."

15.     The Secretary nonetheless falsely proclaims an ambiguity where none exists, and

in the guise of "interpretation" offers an artificial, ungrammatical, result-oriented reading of the

IRA that: (a) splits the single unitary antecedent clause into two parts; and then (b) declares, by

Secretarial fiat, that "such members" (in category two) refers only to "members of any

recognized tribe" (in category one)—abruptly stopping her reading before reaching the "now

under Federal jurisdiction" portion of that same antecedent phrase.  In doing so, the Secretary

cleaves in two a single antecedent phrase without any basis in grammar rules, law, or logic.

16.     The result is that the ROD completely re-writes the second definition of "Indian"

in the IRA, which the ROD tellingly reformulates as follows:

> The IRA applies to "Indians," including "descendants of *[members of any*
> *recognized Indian tribe]* who were, on June 1, 1934, residing within the present
> boundaries of any Indian reservation.

17.     The ROD's newly-minted reformulation of Section 479 (inserting within brackets a partial, incomplete quote of the antecedent phrase) excises the demonstrative adjective "such" and its natural reference to "members of any recognized tribe now under Federal jurisdiction."

18.     The Secretary's unnatural and ungrammatical reading of the IRA is directly belied by (a) the IRA's legislative history; (b) contemporaneous interpretations by the Department of Interior; (c) numerous agency interpretations of the IRA's definition of "Indian" for purposes of determining who is an Indian for purposes of federal hiring preferences; (d) the Department's fee-to-trust regulations in 25 CFR Part 151 (e.g., 25 CFR § 151.2(c)(2)); and (e) positions taken by the Department of Justice and Department of the Interior in prior litigation.

19.     The language of Section 479 is not ambiguous.  For more than 80 years the Department and other federal agencies have correctly interpreted the IRA's second definition of "Indian" as a subset of the first category, naturally reading it as being subject to the "now under Federal jurisdiction" requirement in category one.

20.     The legislative history is clear as to the purpose of the second definition of "Indian" and directly confirms the plain reading of the text.  Indian Secretary John Collier, who was the principal author of the IRA and was recognized by the Supreme Court in *Caricieri* as an authority on the IRA's legislative history, issued a Department Circular in 1936 that directly addressed the definition of eligible Indians under category two of the IRA. See Circular No. 3134 (March 7, 1936).  In that Circular, which Collier sent to Indian Offices around the country, the second category largely overlaps with the first category and was intended to cover only a few individuals then living, in certain unusual circumstances.  Collier expressly stated "[t]here will not be many applicants under Class 2, because most persons in this category will themselves be enrolled members of a tribe …." He explained that this second definition was needed to cover

tribal members' children who were not yet enrolled members of a tribe, and other "unenrolled members residing on a reservation June 1, 1934 (Class 2)." *Id.*

21.     The Secretary's reading in the ROD some 80 years later ignores both the text and context of the IRA's definition of "Indian" in 1934.  The Secretary takes what Congress intended to be a closed universe of potentially eligible Indians under the second definition, limited to Indians living on federal reservations in 1934 who were descended from members of tribes then under federal jurisdiction, and converts it into an open-ended eligibility standard that any tribe can meet.

<u>Unprecedented Reading of Indian "Reservation"</u>

22.     The Secretary's finding that the Mashpees had a "reservation" within the borders of an incorporated town laid out under Massachusetts law, and subject to state and local governance, contradicts the settled meaning of an Indian reservation used in the IRA.  Under prevailing legal definitions, then and now, a tribe must exercise tribal jurisdiction over tribal lands, as stated in case law and the Department's own regulations pertaining to land acquisitions under the IRA (25 CFR Part151). The lands in the Town of Mashpee did not, and do not, meet that definition.

23.     The Mashpees did not exercise tribal jurisdiction over the Town of Mashpee lands in 1934.

24.     The lands in the Town of Mashpee were not set aside or superintended by the federal government at any time.

25.     The non-reservation lands in the Town of Mashpee were *never* under *federal* jurisdiction.

26.     The Town of Mashpee lands do not constitute a reservation under the IRA.

27.     The Secretary has no authority under the IRA to take the lands into trust in Taunton (or the Town of Mashpee), because the Mashpees are not eligible under the IRA.  This means the acquired lands in Taunton (and Mashpee) are not Indian lands, do not constitute an Indian reservation, and cannot serve as the Mashpees' "initial reservation" under IGRA, and therefore cannot serve as the site for a tribal casino under IGRA.

Finding of Significant Historical Connection to Taunton

28.     The ROD's conclusion that Taunton lands are located within an area where the Mashpees have significant historical connections (25 CFR § 292.6) lacks support in the record. While the Mashpees maintained a consistent presence in the Town of Mashpee some fifty miles away, the ROD identifies no Mashpee connection to the 151 acres in question in Taunton, and the Mashpees offered little evidence of any connection to any lands in the surrounding area. Other tribes have claimed the Taunton lands are not and never have been Mashpee.  On the record presented, the Secretary's factually unsupported conclusion in this regard is arbitrary and capricious, constitutes an abuse of discretion, and is not in accordance with the Department's prior precedents construing "historical connections."

Deference to Secretary's Unprecedented Reading

29.     The Secretary's unprecedented and ungrammatical reading of the IRA is not entitled to any deference under *Chevron* principles; nor can it be salvaged by the Indian canon of construction, which provides no authority to misread the plain language of a statute.

Constitutional Non-delegation Claim

30.     Separate and apart from the Secretary's misreading of the IRA, the Secretary lacks constitutional authority to take land into trust for any tribe, including the Mashpees.  The

purported statutory basis for the Department's land acquisition process (25 U.S.C. § 465) violates constitutional limits on the delegation of legislative power.  See U.S. Const., Art. I, § 1.

### The ROD's Harmful Consequences

31.     The creation of an Indian reservation—a federally-created sovereign Indian enclave in the middle of Southeastern Massachusetts—complete with a tribal resort-casino, will forever change, in a unique fashion, the character and governance of the area.  It will create a tax-exempt, regulation-free zone for tribal development that will impose a host of substantial negative impacts on area residents while simultaneously taking away the ability of affected property-owners to petition their elected officials to provide meaningful mitigation through local land use and zoning laws.

32.     In stark contrast to a commercial operation, the residents will have no local or state recourse to address the harmful impacts resulting from the Mashpees' casino-resort development, which include but are not limited to traffic congestion and heightened exposure to motor vehicles fumes associated with 5.3 million visitors annually (ROD at 27) resulting in more than 10,000 incoming vehicle trips each day.  ROD at 33 (casino operations "will increase in daily vehicle trips on local / regional roads, resulting in additional emissions of VOC, NOx, ground-level $CO_2$ and GHGs."). Likewise, Plaintiffs have no local or state recourse to address other negative impacts from the tribal casino-resort's operations such as the  facility's 24-hour operations and associated noise and light pollution (including from outdoor lighting for safety); surface water runoff; flooding due to changes in streams, dams and other water control devices on the property; groundwater depletion and pollution impacting community water wells; and aesthetic harm in the form of grossly out-of-character, high-rise buildings located in a quiet residential area.

33.     The creation of an Indian reservation in Taunton, over which the Mashpees exercise sovereign authority with the right to undertake any and all commercial and industrial activity on the land free of state and local laws, will reduce residential property values.

34.     Prior to the ROD, the existing commercial site was regulated by the City of Taunton and consisted of an aesthetically unobtrusive, low-density "garden-type" industrial park, which is home to several low-rise warehouses hidden below the tree line.  The warehouses and warehousing operations do not visually or otherwise intrude on the residential areas next to it. This appropriately scaled commercial use will be converted into a large destination resort-casino with high-rise towers and parking structures and lots for 6,000 vehicles, and is expected to draw more than 5 million visitors each year—all beyond state and local regulation.

35.     The conversion of the industrial park to an Indian reservation will also mean the loss of tax revenue from the warehouse operations on the land.  This will produce a $375,000 loss in tax revenue each year for the residents of Taunton.

36.     The conversion of the City-zoned industrial park to a reservation leaves nearby residents unprotected from all development of the land, as there would be no government body— local, state or federal—with jurisdiction to address their concerns.

37.     Because the casino-resort development will occur on sovereign lands under the control of the Mashpee, and not subject to state, county or local laws, Plaintiffs will be deprived of any meaningful avenue to secure mitigation of the impacts from the development of the site as a tribal casino-resort.

38.     Plaintiffs each will be directly harmed by the development of the site as a tribal casino-resort including by unmitigated traffic congestion, air pollution, noise pollution, water

pollution, and light pollution, and each will bear the visual and aesthetic impacts of this major alteration in the use and occupancy of the nearby property to their economic detriment.

## PARTIES AND STANDING

39.     Plaintiffs are each residents of the City of Taunton and live close to the casino development site.

40.     Plaintiffs David Littlefield and Michelle Littlefield reside at 192 Erin Road, East Taunton, Massachusetts.

41.     Plaintiff Tracey Acord resides at 106 Sagamore Road, East Taunton, Massachusetts.

42.     Plaintiffs Deborah Canary and Francis Canary, Jr. reside at 1059 Middleboro Avenue, East Taunton, Massachusetts.

43.     Plaintiff Veronica Casey resides at 32 Stevens Street, East Taunton, Massachusetts.

44.     Plaintiff Patricia Colbert resides at 148 Caswell Street, East Taunton, Massachusetts.

45.     Plaintiffs Vivian Courcy and Will Courcy reside at 170 Seekell Street, East Taunton, Massachusetts.

46.     Plaintiffs Donna DeFaria and Antonio DeFaria reside at 12 Middleboro Avenue, East Taunton, Massachusetts.

47.     Plaintiffs Kim Dorsey and Kelly Dorsey reside at 44 Woodlawn Street, East Taunton, Massachusetts.

48.     Plaintiffs Francis Lagace and Jill Lagace reside at 36 Stevens Street, East Taunton, Massachusetts.

49.     Plaintiffs David Lewry and Kathleen Lewry reside at 54 Middleboro Avenue, East Taunton, Massachusetts.

50.     Plaintiffs Michele Lewry and Richard Lewry reside at 76 Middleboro Avenue, East Taunton, Massachusetts.

51.     Plaintiff Robert Lincoln resides at 66 Bluejay Lane, East Taunton, Massachusetts.

52.     Plaintiff Christina McMahon resides at 158 Bluejay Lane, East Taunton, Massachusetts.

53.     Plaintiff Carol Murphy resides at 66 Colonial Drive, East Taunton, Massachusetts.

54.     Plaintiff Dorothy Peirce resides at 155 Cotley Street, East Taunton, Massachusetts.

55.     Plaintiff David Purdy resides at 61 Silvia Farm Drive, East Taunton, Massachusetts.

56.     Plaintiff Louise Silvia resides at 255 Hart Street, Taunton, Massachusetts.

57.     Plaintiffs' injuries and grievances were caused, facilitated or made possible by the activities of the Defendants that form the basis of this Complaint, and will be redressed by a ruling in their favor.

58.     Plaintiffs' interests fall within the zone of interests protected by the laws sought to be enforced in this action.

59.     Defendant United States Department of the Interior is an agency of the United States; Sally Jewell is the Secretary of the Interior; Lawrence Roberts is the Acting Assistant Secretary – Indian Affairs. These defendants are responsible officers of the United States. Each bears responsibility for the decision to take into trust the land at issue.

## JURISDICTION AND VENUE

60.     Plaintiffs bring this action under the Administrative Procedure Act, 5 U.S.C.

§ 701, et seq. (APA) and Article I, Section 1, of the Constitution of the United States. This Court

has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1361 (federal question jurisdiction

and suits to compel actions by federal agencies) and may issue declaratory relief under 28 U.S.C.

§§ 2201 and 2202.

61.     There currently exists an actual controversy between the parties.

62.     Judicial review of the ROD is authorized by the APA, 5 U.S.C. § 701, et seq.  The

ROD is a final determination by the Department of the Interior.

63.     Venue in this Court is proper under 28 U.S.C. §§ 1391(b)(2) and 1391(e)(2) and

(3) and 5 U.S.C. § 703 because a substantial part of the events giving rise to the claims occurred

in the District; the property that is the subject of the action is situated in the District; and

Plaintiffs reside in the District.

## FACTS

The 151 Acres in Taunton

64.     The lands in Taunton have been under the governance of the Commonwealth (and

its political subdivisions) since the formation of the Commonwealth and its entry into the United

States in 1788.

65.     Before 1788, the governing bodies respecting these same lands consisted of

Colonial governments, British governors under authority of the Crown, and the Plymouth

Colony.

66.     Taunton was founded by settlers from England and officially incorporated as a town on September 3, 1639.  Most of the town's settlers were originally from Taunton in Somerset, England, which led early settlers to name the settlement after that town.

67.     No tribal body has exercised tribal governmental authority over these lands for over three hundred years.

68.     Until the issuance of the ROD on September 18, 2015, the City of Taunton exercised taxing and regulatory authority over the lands, including subjecting the lands to the City's zoning and land use laws.

69.     In or about 2002, the Taunton Development Corporation (TDC), a non-profit private corporation organized to promote economic development in Taunton, acquired fee title to the lands.

70.     The City of Taunton zoned the Taunton lands for economic development and approved a garden-type warehouse development in 2003.  The low-rise of the warehouse buildings, together with tree lines and buffers, provided visual separation between the warehouse complex and nearby homes.

71.     On October 30, 2015, the TDC conveyed the subject lands to the Mashpees.

72.     On November 10, 2015 the Mashpees conveyed the subject lands to the United States to be held in trust.

<u>The 170 Acres in the Town of Mashpee</u>

73.     The Town of Mashpee was incorporated as a Town under the laws of the Commonwealth in 1870.

74.     For the past 145 years the Mashpees' landholdings in the Town of Mashpee have been under the regulatory authority of the Commonwealth and its political subdivisions.

75.     Unlike Taunton, the Town of Mashpee has had a significant Indian character, and constitutes the Mashpees' home, with tribal offices, historic buildings, and burial grounds located there.

76.     The Mashpees' so-called "Plantation" located within the Town of Mashpee does not meet the legal definition of an Indian reservation.

77.     The Town of Mashpee was founded in the 17th Century as a Christian "praying town"—a religious community for Indians—where evangelical Christians invited Indians to reside and learn about Christianity and convert to the same, and were subject to the Christian settlers' oversight.

78.     The Mashpees did not exercise plenary tribal jurisdiction over the lands in the Town of Mashpee.  Any purported exercise of governance by the Mashpees within the Town of Mashpee was subject to the control of Christian overseers, Colonial governments, the British Crown, and the Commonwealth.

79.     The federal government never set aside any lands as a reservation for the Mashpees.

80.     The federal government never superintended any lands held by the Mashpees.

81.     The Mashpees have been under state jurisdiction since the United States was established.

<u>The Mashpees' Prior Unsuccessful Lawsuits to Obtain Tribal Recognition and Recover Possession of Tribal Lands</u>

82.     A group claiming to be the "Mashpee Tribe of Indians" filed suit in federal district court in Massachusetts in 1975 seeking to recover possession of tribal lands in Southeastern Massachusetts, purportedly taken unlawfully by the Commonwealth in the 19th Century.  The so-called "Mashpee Tribe of Indians" named as defendants the Town of Mashpee

and the Commonwealth.  After a 40-day jury trial, with extensive testimony and written reports provided by ethno-historians concerning the history of the tribe, the jury determined the Mashpees had ceased to exist as a tribe by 1869. *Mashpee Tribe v. Town of Mashpee*, 447 F. Supp. 940, 942 (D. Mass. 1978) (special interrogatory "d").

83.     The federal court trial record included evidence that the Mashpees desired to become citizens of the Commonwealth, petitioned for the right to secure such status, and in fact voted to become state citizens after passage of an act on June 23, 1869, which granted "citizenship to the Indians, removing their legal disabilities, and released the restraints on alienation . . . ." *Id*.

84.     The federal district court judge overseeing the trial concluded that "from all the evidence, the jury was entitled to find that tribal identity had been abandoned at some time between 1842 and 1869." *Id*. at 946.

85.     The district court dismissed the related land claims which required the Mashpees to prove (among other things) that it was a tribe at that time of filing the land claim lawsuit.

86.     The jury's findings and the district court's dismissal of the land claims were affirmed on appeal.  *Mashpee Tribe v. Town of Mashpee,* 592 F.2d 575 (1st Cir. 1979).

87.     The same group of Indians commenced a series of follow-on lawsuits also claiming to be the Mashpee Tribe, including bringing land claims against the federal government. These claims were rejected by both the district court and circuit court as improper efforts to re-litigate matters resolved against the group by the jury's finding in 1978 that they were not a tribe.  *See Mashpee v. Wolff*, 542 F. Supp. 797 (D. Mass. 1982); *aff'd* 707 F.2d 23 (1st Cir. 1983); *see also Mashpee Tribe v. Secretary of the Interior*, 820 F.2d 480, 482-483 (1st Cir. 1987) (affirming dismissal of further lawsuit by Mashpee Tribe on res judicata grounds and

holding that the other plaintiff-tribes (Christiantowns, Chappaquiddicks, Herring Ponds and Troys) lost tribal identity in late 1800s just like the Mashpees).

88.     The Department of the Interior in *Mashpee Tribe v. Secretary of the Interior*, 820 F.2d at 482, successfully invoked the defense of res judicata citing the 1978 jury determination adverse to the Mashpees' claim to be a tribe, and thereby established a complete defense to the Mashpees' land claims against the federal government.

89.     The Department of the Interior's successful invocation of res judicata in *Mashpee Tribe v. Secretary of the Interior* creates an impossible conflict for the Secretary:  On the one hand, the Secretary argued in this Court that the Mashpees lost their tribal identity no later than 1869 and were not a tribe in 1975, but on the other hand, the Secretary is now claiming that the Mashpees never lost their tribal identity and were properly recognized as a tribe in 2007.

90.     While judicial estoppel is not typically available against the federal government, such an equitable bar should be recognized here to prevent the Secretary from taking such conflicting positions in litigation before the very same court.

The Department of the Interior's Administrative Recognition of the Mashpee
Wampanoag Tribe in 2007

91.     The same group of Indians who failed to prove in federal court that they were tribal Mashpees for purposes of bringing tribal claims to recover possession of tribal lands, nonetheless successfully applied for federal recognition as a tribe through the Office of Federal Acknowledgement (OFA) within the Department of the Interior.  The Mashpees' administrative recognition came in 2007, after a period of agency examination by the OFA that is notable for the lack of transparency, limited opportunity for public comment, absence of a balanced presentation of evidence, rejection of settled criteria for determining tribal status, and creating a

"modern" test for tribal existence that has no bearing on what Congress intended in 1934 when it used the term "tribe" in the IRA.

92.     The OFA's administrative recognition of the Mashpee Wampanoag Tribe in 2007 contradicted the expert ethno-historian who testified, on behalf of the Town of Mashpee in the 40-day trial, that the Mashpees had long ago abandoned their tribal identity—and directly contradicted the jury's express factual finding (affirmed by this Court and First Circuit) that the tribe abandoned its tribal identity in1869.

93.     The Department's administrative determination recognizing the Mashpees as a tribe, issued in 2007, stands in direct conflict with the prior judicial determination that the Mashpees abandoned their tribal identity somewhere between 1842 and 1869, and were not an existing tribe in 1975 when several Mashpees filed a land claim lawsuit in this Court, as expressly determined by this Court and affirmed on appeal.

94.     The Department's 2007 administrative determination addresses the Mashpees' unsuccessful federal court litigation and in essence concludes that the federal court applied different legal standards as they relate to tribal recognition.  According to the Department, the administrative test set out in 25 CFR Part 83 is intended to be less restrictive and dispenses with such traditional criteria as political independence, economic autonomy, and cultural distinctiveness.

95.     The administrative test adopted by the Department through its rulemaking procedures establishes a liberal threshold for recognition, which permits federal acknowledgment of tribes whose members are fully assimilated into mainstream society as measured by economic, social, political and cultural integration.

96.     The Department's administrative test under 25 CFR Part 83, adopted in 1978, does not provide the controlling legal standard for determining who is a "tribe" within the meaning of the IRA; rather, it is what the Seventy-Third Congress and the Department of the Interior in 1934 understood constituted an Indian tribe, and whose members would be eligible under Section 479 of the IRA.  The legislative history demonstrates that assimilated Indians who were citizens of states and adopted the clothing, education, social, economic and cultural standards of the dominant society were not intended to be brought under the IRA. The IRA was designed to help impoverished tribal Indians living on reservations provided they were members of a federally recognized tribe then under federal jurisdiction, as well as Indians who had 50% or more Indian blood (whether or not living tribally).  Other Indians—including assimilated Indians living as citizens of states—were beyond the scope of the IRA according to both the drafters and adopters of that bill.

The Mashpees' 2007 Fee-to-Trust Application and Reservation Shopping

97.     As soon as a group of Mashpee Indians obtained administrative recognition as a federal tribe in 2007, they submitted an application to the Department of the Interior seeking to establish an initial reservation within the meaning of IGRA to support a casino (hereafter "casino reservation").

98.     The Mashpees first applied for a casino reservation in Middleboro by application dated August 20, 2007.

99.     The Mashpees amended their application to switch the casino reservation to Fall River, by amended application dated July 13, 2010.  That application was removed from review by the BIA in January 2012.

100.     The Mashpees then reapplied for a casino reservation in Taunton on June 5, 2012.

101.   In each application and amended application, the Mashpees requested that the Secretary take into trust 170 acres located in the Town of Mashpee, with each application identifying those lands as the tribe's home base where tribal offices, tribal museum, tribal Meeting House, tribal parsonage, and other tribal resources were based.

102.   Middleboro is located 42 miles from the Town of Mashpee.

103.   Fall River is located 53 miles from the Town of Mashpee

104.   The City of Taunton is located 50 miles from the Town of Mashpee.

105.   The Mashpees' serial applications show the Tribe engaging in "reservation shopping," looking for the best economic deal without any concern for what evidence might connect the tribe to any particular location.

<u>The Record of Decision</u>

106.   On September 18, 2015, the Secretary issued the ROD setting forth her decision to take 321 acres of Mashpee-owned fee lands in trust:  151 acres in the City of Taunton and 170 acres in the Town of Mashpee.

107.   The ROD purports to find in the IRA (25 U.S.C. § 465) statutory authority for the Secretary to take into trust the Mashpees' fee lands, specifically citing the second category of "Indian" under IRA Section 479—and disavowing the first definition.  No such authority exists under a plain reading of the statute.  The Secretary resorts to a tortured, ungrammatical reading to manufacture an ambiguity that does not exist, and then wrongly concludes that the Mashpees are eligible for land acquisitions under the IRA because the tribe's members are the descendants of Indians who lived on tribally-governed lands in the Town of Mashpee in 1934.  The ROD rests on a gross misreading of the statutory language (violating the first antecedent rule) by eliminating an essential temporal restriction on who is an eligible "Indian" under the IRA for

purposes of both categories one and two—and also by treating the tribe's fee lands in the Town of Mashpee, allotted under Massachusetts law, owned by individuals living within the borders of an incorporated town created under Massachusetts law, and governed by a local town government, as an Indian "reservation" for purposes of the IRA, when those lands bear none of the indicia of an Indian reservation under the law.  The Secretary's flawed interpretations of "Indian" and "reservation" under the IRA, to evade the statutory requirements explained in *Carcieri*, is unprecedented as well as ungrammatical, illogical, and contrary to law.  The Secretary's resulting conclusion that she possesses authority under the IRA to take lands into trust for the benefit of the Mashpees is arbitrary, capricious, constitutes an abuse of discretion, and is not in accordance with law.

108.    The ROD takes as a given that the Department's 2007 decision to recognize the Mashpee as a tribe puts an end to any question about the Mashpees' tribal status for purpose of the IRA.  The Secretary does not explain in any meaningful way how the Mashpees can be viewed as a tribe under federal jurisdiction in 1934 for purposes of the IRA when they were first recognized by the OFA in 2007, and when this Court expressly determined that the Mashpees stopped being a tribe sometime between 1842 and 1869.

109.    The Secretary's failure to explain (or at least to try to distinguish) the record in the federal trial, and failure to justify (or at least to attempt to explain) the Department's opposite decision in 2007, leaves these two opposite pronouncements on Mashpee tribal status in 1934— judicial and administrative—unresolved, and with judicial estoppel preventing the Secretary from contradicting the Department's prior judicial pronouncement.

110.    The ROD fails to support the Department's conclusion that the Mashpees qualify as a federally recognized tribe under the IRA.  The Mashpees did not meet their burden to prove

that they were tribally organized and exercised tribal jurisdiction over their lands and people in 1934, much less that they were recognized by the federal government for doing so and fell under federal jurisdiction in 1934.  The ROD's conclusory administrative findings in support of tribal existence and identity in 1934—contradicted by judicial determinations by this Court that rest on contrary Secretarial contentions presented to this Court—are arbitrary and capricious, constitute an abuse of discretion, and are not in accordance with law.

## FIRST CAUSE OF ACTION

(A Declaration that the Department of the Interior Lacks
Statutory Authority to Take Land into Trust for the Mashpees
Because the Mashpees Are Not Eligible Under the IRA)

111.    Plaintiffs repeat and reallege the allegations of Paragraphs 1 to 110 as if fully set forth herein.

112.    The Mashpees have been under the jurisdiction of the Commonwealth since 1788, and before that, Colonial governments.

113.    The Mashpees never entered into a treaty with the federal government.

114.    The Mashpees were not organized as a tribe in 1934.

115.    The Mashpees abandoned their tribal identity between 1842 and 1869, as expressly determined by this Court in 1978 and affirmed by the First Circuit.

116.    Whatever Mashpees (tribal or non-tribal) were living in Massachusetts in 1934, they were under state jurisdiction and not under federal jurisdiction.

117.    The Mashpees were not registered as a tribe with the federal Office of Indian Affairs in 1934.

118.    The federal government provided no oversight over the Mashpees' lands in Massachusetts.

119.    The federal government did not consider the Mashpees eligible for benefits under the IRA in 1934, and specifically did not give the Mashpees the opportunity to organize as a tribe under the IRA in 1934.

120.    The Mashpees never asked for, and never received, the right to cast a vote under the IRA, to organize as a tribe and to obtain IRA benefits.

121.    Before, during and after the passage of the IRA, the Department of the Interior disclaimed federal jurisdiction over Massachusetts Indians, including the Mashpees, determining these Indians were under state jurisdiction.

122.    The Mashpees' "Plantation" was not a reservation within the meaning of the IRA, inasmuch as the lands were not federally set aside or superintended.

123.    The Mashpees did not reside on a reservation within the meaning of the IRA in 1934.

124.    The Mashpees did not exercise tribal jurisdiction over the at-issue lands in 1934.

125.    The ROD applies a legally incorrect definition of "Indian" under the IRA.

126.    The ROD applies a legally incorrect definition of Indian "reservation" under the IRA.

127.    The ROD applies a legally incorrect definition of "tribe" under the IRA.

128.    The ROD fails to apply the Department's own definition of "reservation" contained in its fee-to-trust regulations (25 CFR Part 151) which states the requirement that the tribe must exercise tribal jurisdiction over the lands.

129.    The ROD evaluated the Mashpees' fee-to-trust application under the "off-reservation" provisions under 25 CFR Part 151, which further acknowledges the Department's awareness that the lands in the Town of Mashpee do not qualify as a reservation under the IRA.

130.     The Mashpees were not a federally recognized tribe under federal jurisdiction in 1934.

131.     The ROD violates the Supreme Court's decision in *Carcieri*.

132.     The ROD's conclusion that the Mashpees are eligible for fee-to-trust land acquisitions under the IRA is legally flawed and not in accordance with law, is arbitrary and capricious, and constitutes an abuse of discretion.

## SECOND CAUSE OF ACTION

(A Declaration that the Record of Decision Is Arbitrary, Capricious,
Constitutes an Abuse of Discretion, and Is Not in Accordance with Law in Concluding that the
Mashpees Demonstrated a Significant Historical Connection to Taunton)

133.     Plaintiffs repeat and reallege the allegations of Paragraphs 1 to 132 as if fully set forth herein.

134.     Under the Secretary's regulations pertaining to gaming on newly acquired lands (25 CFR Part 292), a tribe must demonstrate a "significant historical connection" to the acquired lands before the tribe is eligible to use the land for gaming—to avoid "reservation shopping."

135.     The Mashpees' application demonstrated a significant historical connection to the Town of Mashpee, 50 miles distant from the City of Taunton.

136.     The Mashpees produced no evidence of a significant historical connection to the 151-acre parcel taken into trust by the Secretary in the City of Taunton.

137.     The Mashpees produced no physical evidence (burial site, artifacts or other evidence) demonstrating any connection to lands located within the boundaries of the City of Taunton.

138.     The ROD's conclusion that the Mashpees used lands located near Taunton for subsistence purposes rests on speculation and an improper legal standard.

139.     The artifacts collected from eleven miles away in the Town of Bridgewater are ambiguous as to tribal affiliation and are insufficient to establish the Mashpees' historical use of the lands in or near Taunton, as opposed to use by other Algonquin–speaking tribes in the area.

140.     In evaluating the historical connections of the Mashpees to the Taunton parcel, the ROD embraces a legally incorrect standard that relieves tribes of having to make a meaningful showing that the tribe (and not other Indians who occupied the area) had a significant historical connection to the area.

141.     The ROD misrepresents the historical record as to how the Mashpees fit within the larger group of Algonquin–speaking tribes.

142.     The Secretary appears to reason that since the Mashpees spoke the Algonquin language and were united with other Algonquin-speaking tribes in a larger affiliation of Algonquin-speaking Indians known as the Wampanoag, historical findings of any one tribe inure to the benefit of any other tribe within that larger group for purposes of satisfying the requirement of a significant historical connection.  That approach is inconsistent with how the federal government recognizes tribes; how ethno-historians classify tribes; and how the Department has analyzed "significant historical connections" for other tribes.

143.     The analysis employed in the ROD, and the conclusion reached in it with respect to the Mashpees' connection to Taunton, are unprecedented.

144.     The ROD's conclusion that the Mashpees demonstrated a significant historical connection to the acquired lands in Taunton is arbitrary, capricious, constitutes an abuse of discretion, and is not in accordance with law.

### THIRD CAUSE OF ACTION

(A Declaration that the Record of Decision Is Arbitrary, Capricious,
Constitutes an Abuse of Discretion, and Is Contrary to Law in Concluding that
the Two Physically Distant Acquisitions Represent the Mashpee's "Initial Reservation"
for Purposes of the Indian Gaming Regulatory Act)

145.    Plaintiffs repeat and reallege the allegations of Paragraphs 1 to 144 as if fully set forth herein.

146.    The ROD declares the two physically separate trust acquisitions—151 acres in Taunton and 170 in Mashpee—as a single "initial reservation" for purposes of IGRA.  That designation purports to bring both fee-to-trust acquisitions within an exception that permits Indian gaming on acquired lands notwithstanding IGRA's general prohibition against gaming on lands acquired after 1988.

147.    The ROD's treatment of the two physically separate trust acquisitions as a single reservation, despite being 50 miles distant from one other, is unprecedented.

148.    The ROD recites other cases where the Secretary has declared noncontiguous parcels to be a single "initial reservation" but the Secretary has done so only upon finding that both parcels fall within the boundaries of a previously recognized treaty reservation.

149.    The Mashpees did not have a treaty reservation; no such reservation boundaries unite the two parcels in question here.

150.    The ROD's conclusion that the two Mashpee land acquisitions, 50 miles apart, constitute a single "initial reservation" under IGRA, is arbitrary and capricious, constitutes an abuse of discretion, and is not in accordance with law.

## FOURTH CAUSE OF ACTION

(A Declaration that the Record of Decision Is Arbitrary, Capricious, Constitutes an Abuse of Discretion, and Is Contrary to Law in Reaching Contradictory Findings About Whether the Mashpees Had a Reservation Before the Secretary Acquired the Subject Lands)

151.     Plaintiffs repeat and reallege the allegations of Paragraphs 1 to 150 as if fully set forth herein.

152.     The ROD claims the Mashpees' "Plantation" in the Town of Mashpee was a "reservation" for purposes of the IRA, but then concludes that the lands taken into trust under the ROD, including lands within the Town of Mashpee that made up the "Plantation," constitute the Mashpee's "initial reservation" under IGRA.

153.     The Secretary claims the two conceptions of "reservation" are different under the two federal statutes such that the Secretary's findings do not contradict each other.

154.     As a matter of historical fact, and under governing principles of Indian law, the Mashpees' landholdings in the incorporated Town of Mashpee, whether called a "plantation" or something else, never met the definition of an Indian reservation.  The Mashpees did not exercise tribal jurisdiction over the lands in 1934, which were subject to the general laws of the Commonwealth, County and Town since the late 1800s.

155.     The 2015 fee-to-trust acquisitions, if authorized under the IRA, would constitute the initial reservation under IGRA, because the Mashpees' lands within the Town of Mashpee never held the legal status of an Indian reservation—and specifically did not have that status in 1934.  But that means the Mashpees were not living on a reservation in 1934, such that the second category of "Indian" under the IRA does not apply at all to them, since that definition requires residence on a reservation as of June 1, 1934.  The Mashpees are not eligible under the IRA for that reason alone.  On the other hand, if the Mashpees had a reservation in the Town of

Mashpee on June 1, 1934 under the IRA, as the Secretary claims, then the newly acquired lands

cannot be their initial reservation under IGRA.

156.    The ROD's "heads-I-win, tails-you-lose" analysis under the IRA is unsupported

by any authority, contradicts the Department's position taken in other cases where the Secretary

advocated for and applied a single definition of "reservation" under both the IRA and IGRA, and

is arbitrary and capricious, constitutes an abuse of discretion, and is not in accordance with law.

### FIFTH CAUSE OF ACTION

(A Declaration That 25 U.S.C. § 465 Is An Unconstitutional Delegation
Of Legislative Authority)

157.    Plaintiffs repeat and reallege the allegations of Paragraphs 1 to 156 as if fully set

forth herein.

158.    It is fundamental that Congress may not delegate its policymaking functions to an

administrative agency in the absence of an "intelligible principle" that limits the agency's

exercise of that authority.

159.    Section 465 violates these precepts by giving the Secretary of the Interior

unbounded discretion to acquire land "for the purpose of providing land for Indians."  The statute

contains no limiting standards.  The Department's regulations, which cannot in any event

provide a standard when the statute contains none, are similarly lacking in any meaningful

standard.  Those regulations list factors that the Secretary should consider when taking land into

trust, but place no boundaries on that authority.

160.    The delegation of unbounded discretion to the Department is particularly

offensive to the Constitution because the Department is a federally mandated trustee of Indian

lands.  The lack of any statutory limits on the Secretary's discretion when deciding to take land

into trust, when considered with the Department's institutional bias in favor of Indians, creates a decision-making process that is unbalanced and unfair.

161.    As a result, Section 465 is an unconstitutional delegation of legislative authority, is in violation of the separation of powers principles contained in the Constitution, and is invalid.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment:

1.    Declaring Defendants' actions in taking the subject lands into trust to be arbitrary and capricious, to constitute an abuse of discretion, and to be in excess of the Secretary's authority, unconstitutional, and otherwise not in accordance with law;

2.    Invalidating, annulling and declaring illegal the September 18, 2015 ROD which purports to: (a) acquire 151 acres of land, located in the City of Taunton, to be held in trust for the Mashpees under the IRA; and (b) declare such lands eligible for gaming as an "initial reservation" under IGRA—including expressly voiding its determinations that the land is held in trust for the Mashpees; constitutes an Indian reservation; constitutes an "initial reservation" for the Mashpees under IGRA; and is eligible for gaming under IGRA; and

3.    A declaratory judgment affirmatively "unwinding" all of the steps taken by the Defendants to change the status of the lands in Taunton, including requiring the Defendants to return the declared trust land to its non-trust, fee title status prior to the issuance of the ROD, and to rescind the Secretary's reservation proclamation; rescind the Secretary's "initial reservation" determination under IGRA, and otherwise rescind all determinations and directives in the ROD respecting both how title to the land is held and what uses the land may be put to under IGRA; and

4.      A declaratory judgment that the lands in Taunton are subject to state and local taxation and regulation just as they were prior to issuance of the ROD; and

5.      A declaratory judgment that the statutory authority relied on by Defendants to acquire the proposed casino site violates the nondelegation doctrine; and

6.      Awarding Plaintiffs their costs and disbursements, together with reasonable attorney's fees to the extent permitted by law, including, but not limited to the Equal Access to Justice Act; and

7.      Granting Plaintiffs such other and further relief as this Court deems just, equitable and proper.

Dated:    February 4, 2016

Respectfully submitted,


*/s/ Matthew J. Frankel*
David H. Tennant (*pro hac vice* pending)
Matthew Frankel (BBO#664228)
dtennant@nixonpeabody.com
mfrankel@nixonpeabody.com
NIXON PEABODY LLP
100 Summer Street
Boston, MA 02110-2131
(617) 345-1000

Adam Bond (BBO#652906)
abond@adambondlaw.com
LAW OFFICES OF ADAM BOND
1 N. Main Street
Middleborough, MA 02346
(508) 946-1165

4848-7325-8285.4