# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

---

|  |  |
|---|---|
| DAVID LITTLEFIELD, MICHELLE LITTLEFIELD, TRACY ACORD, DEBORAH CANARY, FRANCIS CANARY, JR., VERONICA CASEY, PATRICIA COLBERT, VIVIAN COURCY, WILL COURCY, DONNA DeFARIA, ANTONIO DeFARIA, KIM DORSEY, KELLY DORSEY, FRANCIS LAGACE, JILL LAGACE, DAVID LEWRY, KATHLEEN LEWRY, MICHELE LEWRY, RICHARD LEWRY, ROBERT LINCOLN, CHRISTINA McMAHON, CAROL MURPHY, DOROTHY PEIRCE, DAVID PURDY and LOUISE SILVA,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street, N.W., Washington DC 20240, SALLY JEWELL, in her official capacity as Secretary, U.S. Department of the Interior, 1849 C Street, N.W., Washington, DC 20240, BUREAU OF INDIAN AFFAIRS, U.S. Department of the Interior, 1849 C Street, N.W., Washington, DC 20240, LAWRENCE ROBERTS, in his official capacity as Acting Assistant Secretary - Indian Affairs, U.S. Department of the Interior, 1849 C Street, N.W., Washington, DC 20240, UNITED STATES OF AMERICA.<br><br>Defendants. | Civil Action No.<br>1:16-CV-10184-ADB |

---

# MEMORANDUM OF LAW IN SUPPORT OF
## THE MASHPEE WAMPANOAG INDIAN TRIBE'S MOTION TO INTERVENE

## i. Introduction

The Mashpee Wampanoag Indian Tribe ("the Tribe" or "the Mashpee") respectfully submits this Memorandum in support of its Motion to Intervene. The Tribe seeks to intervene under Fed. R. Civ. P. 24 as of right or, in the alternative, on a permissive basis to: 1) participate in any motion practice remaining in the District Court; and 2) appeal the Court's July 28, 2016 Memorandum and Order ("the Order"), all of which will profoundly affect the Tribe's rights. Memorandum & Order, Jul. 28, 2016 (Dkt. No. 87), at 22.[1] The Tribe's motion is supported by the Affidavit of Cedric Cromwell, Chairman of the Tribe and President of the Mashpee Wampanoag Gaming Authority. *See* Affidavit of Cedric Cromwell ("Cromwell Aff."). The Tribe's motion is further supported by the Tribe's undeniable interest in the subject of this action, namely the validity of a decision by the Department of the Interior ("Department") to place land into trust for the Tribe, or Record of Decision ("ROD"). In light of the Order and at this stage in the litigation, it is imperative that the Tribe be heard in the defense of the ROD, a true and correct copy of which is attached hereto as Exhibit B.

At the time of white contact over four hundred years ago, the Tribe's ancestors were organized into a coalition of loosely confederated sachemdoms in possession of southeastern Massachusetts. ROD, at 62. These lands included modern-day Bristol, Barnstable, and Plymouth Counties, Massachusetts, at a minimum. *Id.* at 63. In 1665, twenty-five square miles of this aboriginal territory were set aside as a praying town. The following year, this grant was confirmed by Mashpee sachems and in 1685 the grant was officially recognized by the General Court of Plymouth Colony as land held in perpetuity by the Tribe. Proposed Finding on the Mashpee Wampanoag Indian Tribal Council, Inc., U.S. Department of the Interior, Office of

---

[1] Pursuant to Rule 24(c), a Proposed Answer stating the Tribe's interests, claims, and defenses is attached as Exhibit A.

Federal Acknowledgement ("Mashpee Finding"),[2] at AR000986–87.[3]  This set-aside was the

Mashpee reservation and the United States denominated it as such at various times. ROD, at

113–14. From that time on, the Tribe suffered steady diminishment of its land until, by the

1960's, even though the Tribe maintained nearly exclusive occupation of the Town of Mashpee

it had fee title to only a few culturally significant parcels (assuming, without admitting, that the

Commonwealth's attempt to extinguish aboriginal title to the Town was effective).  *Id*. at 36–49.

This tragic and decimating pattern of continual land loss was finally reversed on

September 18, 2015, with the Department's issuance of the ROD. On February 4, 2016,

Plaintiffs sued to set aside the ROD, ignoring the ROD's historic significance as a critical step

towards remedying the loss of the Tribe's lands and focusing instead solely on the Tribe's casino

project. Complaint (Dkt. No. 1).[4]  At that time, the Tribe made a judgment that the better course

to protect its newly established sovereign territory was to rely on its immunity from suit and not

intervene, as the Department of Justice ("DOJ") was defending the determination to take land

into trust for the Tribe. Tribal sovereign immunity is a core aspect of sovereignty that tribes

possess and wield to protect tribal people and resources. *Michigan v. Bay Mills Indian

Community,* 572 U.S. __, 134 S. Ct. 2014, 2030 (2014).

Given the Court's Order, it is now essential that the Tribe intervene to defend the ROD in

post-judgment motion practice and on appeal to vindicate the Tribe's history and to protect the

vital importance of *all* its sovereign territory as only the Tribe can do. Fed. R. Civ. P. 24(a). The

---

[2]      In determining that the Tribe was entitled to acknowledgment as a federally recognized Indian tribe, the Department adopted and relied upon the Mashpee Finding in its entirety, and did not make any substantive changes. 72 Fed. Reg. 8,007 (Feb. 22, 2007); 73 Fed. Reg. 18,553 (Apr. 4, 2008).

[3]      Citations and reference to AR refer to the Administrative Record relating to the Department's decision to take land into trust for the Tribe, which the Tribe understands the parties have previously provided to the Court.

[4]      Plaintiffs allege they are residents of Taunton and focused only on the casino project in their complaint but acknowledged that their action would affect parcels located in the Town of Mashpee, as well. Complaint (Dkt. No.1), at 2 n. 1.

land that the Secretary took into trust for the Tribe is the Tribe's initial reservation, it provides an

opportunity to exercise its rights as a sovereign nation, and it represents the promise of lifting the

Tribe's members out of poverty and providing myriad other benefits—educational, cultural, and

otherwise—through the development of a gaming establishment. *See generally* ROD. If the

Order stands, the Tribe risks losing its interests in all of the real estate in Mashpee and Taunton

at issue in this litigation, and will be deprived of an even more valuable interest: the opportunity

to more fully realize its identity as a sovereign nation and to improve the collective condition of

its members following centuries of mistreatment. Upon the entry of the Order, it became

apparent that the United States may not adequately represent the interest of the Tribe, such that

the Tribe recognized the need to intervene. The parties will not be prejudiced in any respect by

the Tribe's intervention, as it does not seek to add to the factual record, engage in discovery, or

otherwise delay the litigation.

For those reasons, set forth in greater detail below, the Tribe requests that the Court grant

the Tribe's motion to intervene as of right or, in the alternative, on a permissive basis.

## ii. Background

### I. Federal Recognition and Trust Application.

After a detailed and lengthy review of the Tribe's history and analysis of the tribal

community, the Department determined in 2007 that the Tribe has continuously existed as a self-

governing Indian people and was entitled to acknowledgment as a federally recognized Indian

tribe. 72 Fed. Reg. 8007 (Feb. 22, 2007); 73 Fed. Reg. 18553, 18553-54 (Apr. 4, 2008). This

determination is entitled to deference by courts. ROD, at 59.[5] Because of its status as federally

recognized, the Tribe was entitled to seek trust land through an administrative process at the

---

[5] Plaintiffs allege that the acknowledgment process and resulting recognition of the Tribe was erroneous.
However, direct challenge to the 2007 decision is time-barred by the APA six year statute of limitations. *Trafalgar
Capital Association, Inc. Cuomo,* 159 F.3d 21, 34 (1st Cir. 1998).

Department and the Tribe did so in 2007. *See* 25 C.F.R. Part 151; ROD, at 5. The Tribe revised

and supplemented its trust application over time, as the Department conducted extensive

environmental, historical, and legal review of the application.

The Tribe proposed that the United States place into trust eleven (11) parcels located in

the Town of Mashpee ("Town"), totaling 170 acres. These include land of historical and cultural

importance to the Tribe, such as the Old Indian Meetinghouse and Tribal Cemetery, the Tribe's

Government Center, and land designated for development as tribal housing. ROD, at 6. The

Tribe also proposed that the United States place into trust seventeen (17) parcels, totaling

approximately 151 acres, located in the City of Taunton ("City") to be developed as a tribal

casino. *Id*. at 7. The City had identified those parcels for economic development purposes and

zoned them as commercial. *Id*. at 128. Projections showed that the casino project will generate

jobs and revenue for both the Tribe and the City. *Id*. at 135.

The Tribe's application explained the importance of having the Property taken into trust.

The Tribe "lacks a federally protected land base, trust lands, or reservation lands," which are

"critical to allowing the Tribe to gain control over its activities and to achieve self-

determination." June 5, 2012 Application, at AR007199. As to the Taunton Parcels, the gaming

establishment to be built on those parcels will be used to address the many economic needs of

the Tribe, including, among other important issues, the Tribal government's approximately $26

million budget shortfall, an unemployment rate of nearly 50%, and the lack of adequate housing

for the Tribe's many low-income members. *Id*. at AR007199–201. In particular, the Tribe's

members had substantial housing needs: tribal members were priced out of the market in the

Town, with the average tribal household having 2.73 persons more than the average household in

the Town. ROD, at 121. Fundamentally, the Taunton Parcels will allow the Tribe to be

economically independent and self-sufficient. The Mashpee Parcels will be used to house the Tribe's government center and also provide the real estate necessary to develop housing for the needs of the Tribe's members. June 5, 2012 Application, at AR007199–201.

During the Department's deliberations on the Tribe's application, the Tribe took steps to establish government-to-government relations with the Town, the City, and the Commonwealth of Massachusetts. The Tribe executed an Intergovernmental Agreement with the Town, in which the Town agreed to support the Tribe's trust application. ROD, at 128. Similarly, the Tribe executed an Intergovernmental Agreement with the City, in which the Tribe agreed to make payments in lieu of taxes to the City and the City agreed to support the Tribe's trust application, upon approval of the proposed project by residents of the City at a special referendum. *Id.* at 129.[6] On March 19, 2013, the Tribe executed a Compact with the Commonwealth,[7] which established the terms of cooperation between those governments on regulation of and jurisdiction over the proposed gaming on the Taunton parcels. 79 Fed. Reg. 6213 (Feb. 3, 2014). These actions were taken in anticipation of the ROD and to provide terms of cooperation among affected governments for continued health and safety on the proposed trust land.

## II.        The Record of Decision.

On September 18, 2015, the Secretary issued the ROD, concluding that the Department intended to accept into trust the eleven (11) parcels located in the Town and the seventeen (17) parcels in the City for the Tribe's benefit. 80 Fed. Reg. 57,848 (Sept. 25, 2015). The purpose of the acquisition was "to provide the Tribe with opportunities for long term, stable economic

---

[6]        The City of Taunton's referendum to approve the Tribe proposed construction and operation of a gaming establishment was held on June 9, 2012, and 63% of the voters approved the proposal. Final Environmental Impact Statement, at AR030489-030490.

[7]        The Governor was authorized to execute a compact with the Tribe in the Massachusetts Expanded Gaming Act, M.G.L. c. 23K.

development and self-government. These opportunities will enable the Tribe to meet the needs of its members by providing land for self-determination and self-governance, cultural preservation, housing, education and otherwise providing for its members." ROD, at 7–8. The decision fundamentally altered the future of the Tribe, as "[m]any tribal members are unemployed and have incomes below the poverty level. Long term, stable economic development would provide employment opportunities for tribal members." *Id*. Gaming revenue will further "greatly enhance the Tribe's ability to preserve its history and community" including maintaining "historic family burial grounds" and programs and services for children. *Id*. at 8. The ROD includes a detailed examination of environmental issues, a thorough review of tribal history, and analyses of governing statutes and regulations.

The Department reached several conclusions in the ROD. First, after a two year long environmental review, there were no environmental impacts resulting from acquisition of the Town parcels, there being no change in use, and the proposed casino development on the City parcels was the preferred development alternative. *Id*. at 12. Second, the Tribe was eligible for trust acquisition under the Indian Reorganization Act, based upon an extensive analysis of the statute and review of tribal history. *Id*. at 77–120. Third, the trust parcels collectively qualified as the Tribe's initial reservation, in accordance with 25 C.F.R. Part 292. *Id*. at 53–77. Fourth, once the trust deeds were executed, the Department would issue a reservation proclamation as to those lands. *Id*. at 136-137.

On November 10, 2015, the Tribe and the Department executed trust deeds for the parcels. Amended Complaint (Dkt. No. 12), ¶82. On December 30, 2015, the Department proclaimed the Tribe's trust land as its reservation. 81 Fed. Reg. 948 (Jan. 8, 2016). By these acts, the Tribe's reservation became Indian country within the meaning of governing principles

of civil and criminal jurisdiction. *See generally, Cohen's Handbook of Federal Indian Law*, §
3.04[1]. As a result, the Tribe quickly negotiated agreements with the Town and City to insure a
smooth transition to tribal authority over its reservation and members. Cromwell Affidavit, ¶¶
10–11.

Since the ROD and the acceptance of the parcels into trust, the Tribe has vigorously
pursued federal grants and programs that are available to tribal trust lands. These include
additional funding from Indian Health Service and Housing and Urban Development for the
planning and construction of Indian housing for its members and pending application for funding
from Environmental Protection Agency to develop a reservation water quality program. *Id*. ¶ 12.
The Tribe broke ground on the casino project at Taunton on April 5, 2016. *Id*. ¶ 13.

In the wake of the Order, the Tribe instructed its Construction Manager at the Taunton
gaming establishment site to stand down on active construction and limit on-site activities to
those necessary to complete work in progress related to utility services and secure the site for
purposes of safety and preservation of tribal materiel stored there. *Id*. ¶ 14.  The site was secure
and on-site construction suspended on August 11, 2016. *Id*.

### iii.  Argument

The Tribe is entitled to intervene as of right or, in the alternative, on a permissive basis to
participate in any post-Order motion practice and appeal. The trust status of the Tribe's Property is
the central subject matter of this litigation. As the Court put it in the Order, "[t]his case arises out of
a decision of the Secretary of the Department of the Interior (the "Secretary") to acquire land in
trust for the benefit of the Mashpee Wampanoag Tribe (the "Mashpee") under Section 465 of the
Indian Reorganization Act ("IRA"), 25 U.S.C. § 465." Order (Dkt. No. 87), at 1. While the other
parties will not be prejudiced in any respect by the Tribe's intervention, the denial of this motion

would deprive the Tribe of bringing its own critical voice to bear on this Court's and any appellate court's consideration of the pending opportunity to radically improve the life of every one of the Tribe's members.

## I.      The Tribe Is Entitled to Intervene as a Matter of Right.

Rule 24(a)(2) provides that on a timely motion, "the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2). There are four requirements to entitle a party to intervene as of right: (i) the timeliness of its motion to intervene; (ii) the existence of an interest relating to the property or transaction that forms the basis of the pending action; (iii) a realistic threat that the disposition of the action will impede its ability to protect that interest; and (iv) the lack of adequate representation of its position by any existing party. *See Negrón–Almeda v. Santiago*, 528 F.3d 15, 22 (1st Cir. 2008); *B. Fernández & Hnos., Inc. v. Kellogg USA, Inc.*, 440 F.3d 541, 544–45 (1st Cir. 2006); *see also* Fed. R. Civ. P. 24(a). In applying this test, a court should be guided primarily by "a commonsense view of the overall litigation." *Pub. Serv. Co. of New Hampshire v. Patch*, 136 F.3d 197, 204 (1st Cir. 1998). Indeed, "[b]ecause small differences in fact patterns can significantly affect the outcome, the very nature of a Rule 24(a)(2) inquiry limits the utility of comparisons between and among published opinions." *Id*. Moreover, it is well-established that "Rule 24(a) is construed broadly, in favor of the applicants for intervention." *Scotts Valley Band of Pomo Indians v. United States*, 921 F.2d 924, 926 (9th Cir. 1990).

As described below, the Tribe satisfies each of the requirements of Rule 24:

**A. The Tribe Has an Interest in this Action that May Be Impaired.**

It is difficult to conceive of an interest that would more powerfully militate in favor of a motion for intervention than the Tribe's here. As described above, *see supra* Part ii, the Property represents the Tribe's first tribal lands, which allow it to exercise its rights as a sovereign nation and govern its reservation. It further affords the Tribe the opportunity to develop a thriving business in the form of a gaming establishment that will benefit the Tribe in myriad respects described above. If the Court's Order stands, the Tribe may lose all of those substantial interests.

For an applicant to justify intervention as of right, its interests must be "significantly protectable." *Conservation Law Foundation of New England, Inc. v. Mosbacher*, 966 F. 2d. 39, 41 (1st Cir. 1992). While "there is no precise and authoritative definition of the interest required to sustain a right to intervene" the would-be intervenor's claims must bear a "sufficiently close relationship to the dispute between the original litigants" and "[t]he interest must be direct, not contingent." *Id.* at 42. "[T]he determination of whether an interest is sufficient for Rule 24(a)(2) purposes is colored to some extent by the third factor – whether disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest." *Id.* This is a very "practical test" of adverse effect. *Daggett v. Comm'n on Governmental Ethics & Election Practices*, 172 F.3d 104, 110-11 (1st Cir. 1999) (holding that the possibility that the litigation could end with an injunction adversely affecting the putative intervenors' interests was sufficient to meet this requirement).

The Tribe's interest in this action is self-evident. As the Court has acknowledged, the Department's decision to take the Tribe's land into trust is at the heart of the case. Order, at 22. The Tribe has a "significantly protectable interest" in this litigation because it has a property interest in the "property . . . that is the subject of the action." Fed. R. Civ. P. 24(a)(2). The Tribe

is the beneficial owner of land placed into trust by the United States, and the land is the Tribe's federally-protected reservation, over which the Tribe exercises significant governmental authority and jurisdiction. Amended Complaint, ¶ 82. These property interests are more than sufficient to satisfy Rule 24. Indeed, under federal law, the Tribe's sovereign interest and powers of self-government are largely tied to its trust land. *See Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 152-154 (1980).

Further, the Tribe has an obvious and direct economic interest in the outcome of this litigation. It has vital economic interests that will be directly affected by the outcome of this lawsuit. The Tribe has a $26 million budget deficit and impoverished members for whom it seeks to provide housing and various services. Mashpee Finding, at AR007199–201. The Tribe's existing funding sources are simply inadequate to meet the needs of the Tribal government and its members. *Id*. As described above and in the ROD, the Tribe plans to engage in economic development by developing a gaming facility. The Tribe has no other trust or reservation lands that can be used for economic development. The proposed economic development project will generate revenue to address the significant unmet needs of the Tribe and its members.

If Plaintiffs prevail, and absent other developments, the Tribe may lose its federally-protected land base and be unable to build and operate the gaming facilities necessary to fund its Tribal government and much-needed programs for its members. *See, supra*, Part ii. If that occurs, it will be prevented from achieving the economic self-sufficiency and governmental self-determination that the ROD would bring to fruition. This would be a crippling blow for the Tribe and its members. Particularly in combination with the Tribe's legal, proprietary and sovereign interests, these direct and important economic interests justify intervention.

The Tribe's position here stands in sharp contrast to that of the Gay Head Tribe of

Aquinnah ("Aquinnah") when it moved to intervene in *KG Urban Enterprises, LLC v. Patrick, et al.* ("*KG Urban*"), 293 F.R.D. 42, 48 (D. Mass. 2013) (Gorton, J), an action concerning the constitutionality of a provision of the Massachusetts Expanded Gaming Act, which is not at issue here.[8] This Court denied the motion to intervene because the Aquinnah *effectively conceded they had no interest* in the litigation. 293 F.R.D. at 47–48. In particular, the action challenged the preference given to tribes with compacts under the Expanded Gaming Act, but the Aquinnah had no such compact. *Id*. Instead, its claimed interest was contingent only upon the possibility of obtaining a compact, and it was uncertain whether that contingent interest would be impaired in the litigation. *Id*. The Aquinnah further could not suggest any reason that the Commonwealth could not adequately represent its interests, and instead argued only that it and the Commonwealth had a "difference of opinion" regarding certain legal arguments the Aquinnah would wish to raise. *Id*. In other words, the Aquinnah's motion presented the Court with precisely the opposite of the situation here, where the Tribe has a very real interest that is distinct from those of the involved government agency.

### B. The Tribe's Interests Are Not Adequately Represented by Any Party.

No party faces the severe risk to its most fundamental interests that the Tribe confronts here. To the extent that Plaintiffs may somehow contend that the Department adequately represents the Tribe's interests, they misapprehend the depth and breadth of interests the Tribe

---

[8] To the extent that the parties may rely upon *KG Urban* to argue that the Court should deny this Motion based upon the *KG Urban* court's ruling concerning the Tribe's limited motion to intervene for the limited purposes of moving to dismiss the case, that reliance is similarly misplaced. *KG Urban* concerned a dramatically different factual context, including that the Department at the time of that litigation had not taken land into trust for the Tribe. *Id*. The Court's sole ruling regarding the Tribe in that matter was that, under Rules 12(b)(7) and 19, neither of which is implicated here, the Tribe was not a "necessary" party justifying a motion to dismiss for failure to join an indispensable party. *Id*. at 49–52. The court so concluded because the interests the Tribe then claimed—including an interest in having the Department "determine whether it is eligible to have lands taken into trust"—were "not in jeopardy" because they would not be lost based on the outcome of the litigation. *Id*. The situation here is the opposite: the Tribe's interests in this litigation are concrete in the form of the Property, as is the direct harm to those interests if the Property does not remain in trust based on the ROD.

has in the Property. The Department's interest is in the administration of federal lands of the United States for the public interest broadly and the implementation of federal Indian policy, not in the particular sovereign, economic, and personal interests of the Tribe and its members.

As the Supreme Court has made clear, the burden of showing that a putative intervenor is not adequately represented is "minimal;" the movant must simply show that representation "may be" inadequate. *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972). Although there is a presumption of adequate representation where the proposed intervenor has the "same ultimate goal" as an existing party—including where the intervenor "attempts to enter on the same side as a government agency to defend the agency's decision"—the burden to rebut that presumption is "not onerous." *Nextel Commc'ns of Mid–Atlantic, Inc. v. Town of Hanson,* 311 F.Supp.2d 142, 151 (D.Mass.2004) (citing *United Nuclear Corp. v. Cannon,* 696 F.2d 141, 144 (1st Cir.1982)).

Even when the movant seeks to intervene "on the same side as a government agency," the proposed intervenor need only show that the government's representation "may be inadequate," not that it actually *is* inadequate. *Mosbacher,* 966 F.2d at 44 (vacating trial court's denial of motion to intervene because intervenors may not have been adequately represented by the Secretary of Commerce); *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 972 (3d Cir. 1998) ("[W]hen an agency's views are necessarily colored by its view of the public welfare rather than the more parochial views of a proposed intervenor whose interest is personal to it, the burden [of the intervenor to show inadequate representation] is comparatively light."). "One way for the intervenor to show inadequate representation is to demonstrate that its interests are sufficiently different in kind or degree from those of the named party." *B. Fernandez & Hnos., Inc. v. Kellogg USA, Inc.*, 440 F.3d 541, 546 (1st Cir. 2006) (citing *Glancy v. Taubman Cts., Inc.,* 373

F.3d 656, 675 (6th Cir.2004)) ("Asymmetry in the intensity ... of interest can prevent a named party from representing the interests of the absentee.") (other citation omitted).

For example, in *Dimond v. D.C.*, the U.S. Court of Appeals for the D.C. Circuit found that the trial court's denial of a motion to intervene on the side of the government defending a statute was an abuse of discretion because the intervenor's interests differed from those of the government. 792 F.2d 179, 191–92 (D.C. Cir. 1986). There, citizen plaintiffs had sued the District of Columbia to challenge the constitutionality of a motor vehicle insurance law. *Id*. at 181. At summary judgment, the trial court found unconstitutional a provision of the at-issue law restricting an accident victim's "right to bring a tort suit to recover noneconomic losses such as pain and suffering unless the victim incurs $5,000 or more in medical expenses." *Id*. Following the entry of judgment, and an order of the trial court clarifying that its ruling meant that the $5,000 medical expenses provision was stricken, an automobile insurance company moved to intervene as a defendant. *Id*. at 193. The trial court denied that motion. *Id*. The D.C. Circuit reversed that denial, explaining that until the District Court "clarified the effect of its ruling . . . [intervenor] might reasonably have believed that the [government's] interest in defending the validity of the [law] would also ensure that [intervenor's] interests were adequately protected." *Dimond*, 792 F.2d at 193. The D.C. Circuit further explained that the District of Columbia may not have adequately represented the movant because of the difference in their respective interests, namely that "the District of Columbia has no financial stake in the outcome of the challenge to the [law]." *Id*. at 192. Indeed, "[a] government entity . . . is charged by law with representing the public interest of its citizens," not the interests of a private intervenor. *Id*.; *Wildearth Guardians v. Salazar*, 272 F.R.D. 4, 15 (D.D.C. 2010) ("[I]t is well-established that governmental entities generally cannot represent the more narrow and parochial financial interest

of a private party") (internal quotations omitted).

Similarly, just over a year ago the U.S. District Court for the District of Maine in

*McDonough v. City of Portland* allowed a motion to intervene on the side of the agency

defending its own action, because the intervenor's interests "differ[ ] in kind and quality."  No.

2:15-CV-00153-JDL, 2015 WL 3755289, at *3 (D. Me. June 16, 2015). There, the City of

Portland was defending its taxi licensing scheme against allegations of reverse racism, namely

that Portland favored minorities and immigrants. *Id*. at *2. A group of taxi drivers who had

benefited under Portland's licensing plan moved to intervene to protect their interests in working

as taxi drivers. *Id*. Plaintiff relied on the presumption that Portland adequately represented the

intervenor, but the court found that the "[intervenor] has the better argument":

> It is apparent that its interests are sufficiently different from
> Portland's and that Portland's representation *may* be inadequate
> because Portland must account for a spectrum of governmental
> interests far broader than the discrete commercial interests
> [Intervenor] seeks to protect. *Mosbacher* requires only that an
> intervenor show that the government's representation *may* be
> inadequate, not that it *is* inadequate. 966 F.2d at 44. [Intervenor]
> has made that showing here.

*Id*. at *3 (emphasis in original).

Here, as in *Dimond*, until the Order the Tribe "might reasonably have believed that the

[government's] interest . . . would also ensure that [intervenor's] interests were adequately

protected." 792 F.2d at 193. Especially in light of the Order, however, the Department may not

adequately represent the Tribe. The Tribe has vital sovereign, proprietary and financial interests

at stake in having their land remain in trust. Like the interests of the intervenors in *Dimond* and

*McDonough*, these interests are different from, and far more direct and immediate than, the

United States' more general interest in defending its agencies' decisions, and only the Tribe can

adequately represent them. *Id*; 2015 WL 3755289, at *3. Even if the United States were able to

adequately protect the Tribe's interests in this suit, that factor is outweighed by the Supreme

Court's strong preference for encouraging Indian tribes to "participat[e] in litigation critical to

their welfare." *Arizona v. California*, 460 U.S. 605, 615 (1983).[9]

### C.       The Motion to Intervene Is Timely.

This motion is timely where the Tribe has brought it within eighteen days after the Order and

as soon as it made the difficult decision to (potentially) waive its sovereign immunity in seeking

intervention. Where the Tribe intervenes solely to engage in post-Order motion practice and for

appellate purposes it does not prejudice the parties in any respect.

Rule 24's timeliness requirement is a check on prejudice, not a time-keeping exercise that

bars intervention after a certain number of days or a particular stage of litigation: "the concept of

timeliness of a petition is not measured, like a statute of limitations, in terms of specific units of

time, but rather derives meaning from assessment of prejudice in the context of the particular

litigation." *Puerto Rico Tel. Co. v. Sistema de Retiro de los Empleados del Gobierno y la

Judicatura*, 637 F.3d 10, 15–16 (1st Cir. 2011) (vacating and remanding denial of motion to

intervene filed after entry of judgment). Indeed, "the point to which a suit has progressed, while

---

[9]       The Department has not yet publicly committed to an appeal of the Order, which is a further, independently sufficient basis to show that the Department may not adequately represent the Tribe. In *Dow Jones & Co. v. U.S. Dep't of Justice*, for example, current Supreme Court Justice Sotomayor, while a U.S. District Court judge, granted a motion to intervene where the government had not yet determined whether to appeal a judgment that was unfavorable to the prospective intervenor, such that her interests may not have been "adequately represented." 161 F.R.D. 247, 254 (S.D.N.Y. 1995). There, under the Freedom of Information Act plaintiffs sought to compel the Department of Justice ("DOJ") to produce a note written by a government official prior to that official's suicide. *Id.* at 249. Justice Sotomayor entered summary judgment for plaintiffs and enjoined the government from withholding the note, and the official's widow moved to intervene for the purpose of bringing an appeal. *Id.* at 250. The widow argued that previously during the case "she believed the government would adequately represent her interest in this matter, and that only with the adverse Order did she realize that the government might not fully exercise its right to appeal." *Id.* at 252–53. Justice Sotomayor agreed, further explaining that the interests of DOJ diverged from those of the putative intervenor where any appeal by DOJ would subject it to a cross-appeal on another issue in the case on which it had prevailed. *Id.* at 253–54.
        To the extent that the Department ultimately decides not to appeal, it is even clearer that the Tribe's interests would not be adequately represented. *See Americans United for Separation of Church & State v. City of Grand Rapids*, 922 F.2d 303, 306 (6th Cir. 1990) (allowing motion to intervene where putative intervenor may not have been adequately represented because party ostensibly representing its interests chose not to appeal); *Pellegrino v. Nesbit*, 203 F.2d 463, 468 (9th Cir. 1953) (reversing denial of motion to intervene post-judgment where putative intervenor would not be adequately represented where party claiming to represent it chose not to appeal).

relevant, is not the dispositive factor in determining timeliness." *Fiandaca v. Cunningham*, 827 F.2d 825, 833 (1st Cir. 1987) (holding that trial court abused its discretion in denying motion to intervene after conclusion of trial).

As the First Circuit has explained, "[t]he timeliness requirement was not designed to penalize prospective intervenors for failing to act promptly [, but] rather [to] insure[ ] that existing parties to the litigation are not prejudiced by the failure of would-be intervenors to act in a timely fashion." *Id.*, at 834 (quoting *Garrity v. Gallen*, 697 F.2d 452, 455 (1st Cir.1983)); *see Banco Popular de Puerto Rico v. Greenblatt*, 964 F.2d 1227, 1232 (1st Cir.1992) ("[T]he purpose of the basic requirement that the application to intervene be timely is to prevent last minute disruption of painstaking work by the parties and the court.") (quoting *Culbreath v. Dukakis*, 630 F.2d 15, 22 (1st Cir.1980)); *Caterino v. Barry*, 922 F.2d 37, 41 (1st Cir.1990) (noting that "avoiding such prejudice [to existing parties]" is the basic purpose of the timeliness requirement, and that in that case permitting intervention "inevitably would delay the start of the trial—unquestionably a detriment to the plaintiffs"). The determination of timeliness lies within the sound discretion of the district court. *NAACP v. New York*, 413 U.S. 345, 366 (1973). Further, the timeliness requirement is "less strict than for a Rule 24(b) motion because greater interests are at stake in the former case." *Fiandaca*, 827 F.2d at 833.

As a result, successful post-trial or post-judgment motions to intervene are not unusual. *United Airlines, Inc. v. McDonald*, 432 U.S. 385, 395–96 (1977) (holding that post-judgment motion to intervene should have been allowed so that intervenor could appeal); *Negron-Almeda v. Santiago*, 528 F.3d 15, 25 (1st Cir. 2008) (reversing trial court's denial of motion to intervene filed one month after the entry of judgment, because that delay was "slight" and the motion to intervene timely where intervener recognized its rights were imperiled upon entry of judgment);

*Puerto Rico Tel. Co. v. Sistema de Retiro de los Empleados del Gobierno y la Judicatura*, 637 F.3d 10, 15–16 (1st Cir. 2011) (remanding for reconsideration trial court's denial of motion to intervene in order to appeal brought after entry of judgment); *Pub. Citizen v. Liggett Grp., Inc.*, 858 F.2d 775, 785 (1st Cir. 1988) (noting that "postjudgment intervention is not altogether rare"). Indeed, where a putative intervenor seeks to participate in appellate proceedings, there is no prejudice to the existing parties, because the prospective intervenor does not seek to add anything to the factual record. *Dimond*, 792 F.2d at 193 ("[S]ince [intervenor] seeks to intervene only to participate at the appellate stage and in any further trial proceedings, its intervention will not prejudice any existing party.").

To determine whether a post-verdict or judgment motion to intervene for appellate purposes is timely, the "critical inquiry" is "whether in view of all the circumstances the intervenor acted promptly after the entry of final judgment." *United Airlines, Inc.*, 432 U.S. at 395–96. Thus, in *Dimond*, discussed *supra* Part I.B., the court concluded that the trial court's denial of an insurance company's motion to intervene for appellate purposes brought shortly after the entry of judgment was an abuse of discretion. 792 F.2d at 191–92. Contrary to the trial court's ruling, the motion was timely, because the movant "moved to intervene only two days after the District Court clarified the effect of its ruling . . . . Until that time, [intervenor] might reasonably have believed that the [government's] interest in defending the validity of the [law] would also ensure that [intervenor's] interests were adequately protected." *Id*; *see Dow Jones & Co. v. U.S. Dep't of Justice*, 161 F.R.D. 247, 252–53 (S.D.N.Y. 1995) (Sotomayor, J.) (granting motion to intervene where putative intervenor "believed the government would adequately represent her interest in this matter, and that only with the adverse Order did she realize that the government might not fully exercise its right to appeal").

Here, similar to *Dimond*, the Tribe has promptly moved to intervene to appeal this Court's judgment. Under the well-established line of cases described above, the motion is therefore timely.[10] Fundamentally, there is no prejudice to the parties, which is the purpose of the timeliness requirement, because the Tribe does not seek to add to the factual record. *Puerto Rico Tel. Co.*, 637 F.3d at 15–16.

To the extent Plaintiffs contend that this motion is nevertheless untimely simply because the Tribe could have but did not bring it sooner, there is a sound reason that the Tribe implicitly relied upon the Department to represent its interests until the entry of the Order: it was determined not to waive its sovereign immunity unless absolutely necessary. Indian tribes are "separate sovereigns pre-existing the Constitution" which hold immunity from suit. *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 56 (1978). This immunity is "a necessary corollary to Indian sovereignty and self-governance." *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Engineering, P.C.,* 476 U.S. 877, 890 (1986); *see also Kiowa Tribe of Okla. v. Mfg. Techs., Inc.,* 523 U.S. 751, 754, 756 (1998); *Nev. v. Hall,* 440 U.S. 410, 414-15 (1979); *Bay Mills Indian Cmty.*, 134 S. Ct. at 2030–31 (holding that Indian tribe was immune from suit by Michigan to enjoin it from operating casino outside its reservation). As a recognized tribe, the Tribe enjoys this same immunity, *Bingham v. Maushop, LLC,* No. BACV2006-00736 (Mass. Super. Ct. June 26, 2007), and a decision to waive this immunity is a serious, weighty decision.

Until the Order the Tribe "might reasonably have believed that the [government's]

---

[10]     Additionally, this motion is timely where the Department has not stated publicly whether it intends to appeal the Order. *See Dow Jones*, 161 F.R.D. at 252–53 (post-judgment motion to intervene timely where putative intervenor did not know whether DOJ would appeal). If the Department ultimately determines not to appeal the Order, it will be even clearer that this motion is timely. *United Airlines, Inc. v. McDonald*, 432 U.S. 385, 389–90, 97 (1977) (post-judgment motions to intervene timely when "filed promptly after the final judgment of a District Court, for the purpose of appealing" and upon learning that party who ostensibly represented the putative intervenor did not intend to appeal). Not only does the potential that the Department will not appeal create an independently sufficient basis to show that it may not adequately represent the Tribe, it also illuminates the difference in degree and kind between the Tribe's interest and the Department's interest.

interest . . . would also ensure that [intervenor's] interests were adequately protected." *Dimond*, 792 F.2d at 191–92; *see Dow Jones & Co.*, 161 F.R.D. at 252–53. The Tribe at all times considered whether waiving its sovereign immunity in order to intervene was warranted. The Tribe determined that waiving its sovereign immunity was not in its interests, especially where it believed that the Department would fully represent its interests. The Order, however, made the path forward for the Tribe clear, to intervene in order to ensure it could protect its interests on appeal.

## II. The Tribe Should Be Allowed Permissive Intervention.

If this Court determines that intervention of right is not appropriate, the Tribe seeks permissive intervention under Rule 24(b). Under 24(b), on timely motion, "the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact. . . . In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b). Unlike the four part test for intervention as of right, permissive intervention requires neither the possibility that the putative intervenor may not be adequately represented nor that the putative intervenor's interests may be harmed. *Daggett,* 172 F.3d at 112–13; *see In re Acushnet River & New Bedford Harbor Proceedings re Alleged PCB Pollution*, 712 F. Supp. 1019, 1024 n.7 (D. Mass. 1989) (stating, with respect to issue of adequate representation, that standards under Rule24(b) are "loosened" in comparison to standards under Rule24(a)). Permissive intervention is "wholly discretionary," and when exercising its discretion, the court may consider "almost any factor rationally relevant . . . ." *Daggett,* 172 F.3d at 113. Here, the Court's discretion should heavily favor the Tribe, because the Tribe's intervention will not cause undue delay or prejudice in this case. Indeed, tribes are routinely permitted to intervene to defend

the Secretary's decisions to accept land in trust on their behalf. *See, e.g., Confederated Tribes of Grand Ronde Cmty. of Oregon v. Jewell*, No. 14-5326 (D.C. Cir. Jul. 29, 2016), slip opinion at *3 (noting that the district court allowed the tribe to intervene); *Michigan Gambling Opposition v. Kempthorne,* 525 F.3d 23, 28 (D.C. Cir. 2008) ("The Tribe was allowed to intervene [in the underlying proceeding] as a defendant."); *City of Roseville v. Norton*, 219 F. Supp. 2d 130, 137 (D.D.C. 2002) (noting that tribe was permitted to intervene); *but see S. Dakota ex rel Barnett v. U.S. Dep't of Interior*, 317 F.3d 783, 785–86 (8th Cir 2003) (remarking that "the [prospective intervenor] Tribe has cited authority that probably would have persuaded us to grant the motion if we were the district court ruling on the motion intervene]," but finding the trial court's denial of the motion was not an abuse of discretion). Because the Tribe's intervention will cause no delay or prejudice to the present parties—*see, supra*, Part I.C., incorporated herein by reference—the Tribe has a vital interest in the subject matter of this litigation, and for the reasons described above, the Court should exercise its discretion to permit permissive intervention.

### iv. Conclusion

For all of the reasons set forth above, the Tribe respectfully requests that the Court enter an order that the Tribe may intervene in the above-captioned proceeding.

Respectfully submitted,

MASHPEE WAMPANOAG INDIAN TRIBE,

By its attorneys,

/s/ Benjamin J. Wish
Howard M. Cooper, Esq. (BBO#543842)
hcooper@toddweld.com
Max D. Stern, Esq. (BBO#479560)
mstern@toddweld.com
Benjamin J. Wish, Esq. (BBO#672743)
bwish@toddweld.com
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA  02110

(617) 720-2626

Arlinda F. Locklear, Esq. (D.C. Bar #962845)
alocklearesq@verizon.net
4113 Jenifer Street, NW
Washington, D.C. 20015
(202) 237-0933
*Admission pro hac vice pending*

Dated:  August 15, 2016

## Certificate of Service

I, Benjamin J. Wish, hereby certify that this document has been filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 15, 2016.

  /s/ Benjamin J. Wish
Benjamin J. Wish

4838-6904-6069, v. 13