# United States Court of Appeals
## For the First Circuit

No. 16-2484

DAVID LITTLEFIELD; MICHELLE LITTLEFIELD; TRACY ACORD; DEBORAH
CANARY; FRANCIS CANARY, JR.; VERONICA CASEY; PATRICIA COLBERT;
VIVIAN COURCY; WILL COURCY; DONNA DEFARIA; ANTONIO DEFARIA; KIM
DORSEY; KELLY DORSEY; FRANCIS LAGACE; JILL LAGACE; DAVID LEWRY;
KATHLEEN LEWRY; MICHELLE LEWRY; RICHARD LEWRY; ROBERT LINCOLN;
CHRISTINA MCMAHON; CAROL MURPHY; DOROTHY PEIRCE; DAVID PURDY;
LOUISE SILVIA,

Plaintiffs, Appellees,

v.

MASHPEE WAMPANOAG INDIAN TRIBE,

Defendant, Appellant,

BUREAU OF INDIAN AFFAIRS, U.S. Department of the Interior; RYAN
ZINKE, in his official capacity as Secretary, U.S. Department of
the Interior; LAWRENCE ROBERTS, Acting Assistant Secretary,
Indian Affairs, U.S. Department of the Interior; U.S. DEPARTMENT
OF THE INTERIOR; UNITED STATES OF AMERICA,

Defendants.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. William G. Young, U.S. District Judge]

---

Before

Lynch, Circuit Judge,
Souter,* Associate Justice,
and Lipez, Circuit Judge.

---

     * Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

Benjamin J. Wish, with whom Howard M. Cooper, Max D. Stern, and Todd & Weld, LLP were on brief, for appellant.

David H. Tennant, with whom Law Office of David Tennant PLLC, David J. Apfel, Roberto M. Braceras, Andrew Kim, and Goodwin Procter LLP were on brief, for appellees.

---

February 27, 2020

---

      **LYNCH**, <u>**Circuit Judge**</u>.  In 2015, the Department of the Interior's Bureau of Indian Affairs ("BIA") approved the taking of two areas of land into trust for the Mashpee Wampanoag Indian Tribe ("the Tribe").  The Tribe planned to use land taken into trust in Mashpee, Massachusetts, largely for housing, while it planned to use land in Taunton, Massachusetts, for economic activities, primarily a gaming casino and resort, to produce needed income for the Tribe.  The BIA's approval construed section 19 of the Indian Reorganization Act of 1934 ("IRA"), 25 U.S.C. § 5129,[1] to permit it to accept lands for the Tribe.  Opposed local residents filed a federal suit challenging the BIA's decision.  The district court found, on its own reading of the statute, that the BIA was wrong that it had authority to take land into trust for the Tribe, and it remanded the matter to the BIA.  The court's order is the subject of this appeal.

      Only a few facts need be recited,[2] and the procedural history of the litigation can be recounted briefly.  After first rejecting appellees' contention that we lack jurisdiction to hear

---

    [1]    At the time of the BIA's 2015 decision, the statutory provision at issue here was located at 25 U.S.C. § 479.

    [2]    A description of the Tribe's history may be found in the BIA's Record of Decision.  <u>See</u> Bureau of Indian Affairs, <u>Record of Decision: Trust Acquisition and Reservation Proclamation for 151 Acres in the City of Taunton, Massachusetts, and 170 Acres in the Town of Mashpee, Massachusetts, for the Mashpee Wampanoag Tribe</u>, at 101-17 (Sept. 18, 2015), https://www.bia.gov/sites/bia.gov/files/assets/public/oig/pdf/idc1-031724.pdf.

this appeal, we then move directly to the issue of statutory interpretation of 25 U.S.C. § 5129, a pure issue of law. We hold that the plain meaning of the IRA's text precludes the BIA's interpretation of that section, and so we affirm.

I.

The IRA authorizes the Secretary of the Interior "to acquire land and hold it in trust 'for the purpose of providing land for Indians.'" Carcieri v. Salazar, 555 U.S. 379, 381–82, (2009) (quoting 25 U.S.C. § 5108). The IRA further defines "Indian" as follows:

> The term "Indian" as used in this Act shall include [1] all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction, and [2] all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation, and shall further include [3] all other persons of one-half or more Indian blood.

25 U.S.C. § 5129 (numbers in brackets added). The Secretary may take land into trust only for persons and tribes that meet one of these definitions of Indian.

The facts underlying this matter are not disputed. The Tribe received federal recognition in 2007. See 72 Fed. Reg. 8007 (Feb. 22, 2007). Shortly thereafter, also in 2007, the Tribe submitted a "fee-to-trust" application requesting that the Department of the Interior acquire land in trust as the Tribe's reservation. The Tribe's application, as last amended in November

- 4 -

2012, requested that the Department accept about 170 acres in Mashpee, Massachusetts, and about 151 acres in Taunton, Massachusetts. The Mashpee land was already owned by the Tribe and in tribal use. The Tribe planned to acquire the Taunton land, which was "developed as a commercial/industrial park," to build and run "an approximately 400,000 sq. ft. gaming-resort complex, water park, and 3 hotels."

On September 18, 2015, the BIA issued a written decision that granted the Tribe's fee-to-trust application. On November 10, 2015, the Department took the lands into trust and, shortly thereafter, proclaimed the land to be the Tribe's reservation. See 81 Fed. Reg. 948 (Jan. 8, 2016).

On February 4, 2016, the plaintiffs filed suit to challenge the BIA's decision taking the land into trust. On July 7, 2016, the parties cross-moved for summary judgment on the plaintiffs' first cause of action. Plaintiffs requested that, if the district court found that the BIA exceeded its statutory authority, it also issue a "final, appealable order" so that the judgment would be "immediately appealable." The defendants did not oppose this argument.

On July 28, 2016, the district court found that the BIA had exceeded its authority, entered summary judgment for the plaintiffs under Fed. R. Civ. P. 54(b), and ordered the matter remanded to the agency. On October 12, 2016, the court issued an

order clarifying "that it ruled that in order to qualify as eligible beneficiaries under the second definition of 'Indian' set forth in the [IRA], the [Tribe was] required to have been 'under federal jurisdiction' in 1934." The court explained that "[h]aving remanded this matter to the Secretary, it is no violation of the Court's order should the agency wish to analyze the [Tribe's] eligibility under the first definition of 'Indian.'"

On December 8, 2016, the Tribe brought this appeal. The government also appealed, but on April 27, 2017, it moved to dismiss voluntarily its appeal. The government's motion did not offer a reason for the decision to dismiss its appeal.

On September 7, 2018, the BIA issued a new decision that addressed whether the Tribe could qualify under the first definition. It concluded that the Tribe was not under federal jurisdiction in 1934 and could not qualify under the first definition. The BIA also specifically stated that its "analysis and decision on remand is strictly limited to the question of the Tribe's jurisdictional status in 1934, and does not otherwise revisit or alter the remainder of the Department's analysis of the second definition of 'Indian' in the 2015 [decision]."

On September 27, 2018, the Tribe sued the Secretary of the Interior ("the Secretary") in the U.S. District Court for the District of Columbia to challenge the BIA's second decision concluding that the Tribe did not meet the first definition of

"Indian" under the IRA.  See Complaint, Mashpee Wampanoag Tribe v. Zinke, No. 1:18-cv-02242 (D.D.C. Sept. 27, 2018).  The Tribe's complaint alleges that the Secretary's application of the first definition was arbitrary, capricious, and contrary to law in violation of the Administrative Procedure Act, 5 U.S.C. § 706. Id. at 18.  Appellees here moved to intervene in that case without opposition, and, as of October 29, 2019, cross-motions for summary judgment were fully briefed.  Nothing in the Tribe's complaint in the D.C. case or the summary judgment briefing implicates the BIA's interpretation of the second definition of Indian, at issue here.

II.

Having won in the trial court, appellees try to prevent appellate review by arguing we lack jurisdiction to hear this appeal.  They give two reasons.  First, they contend that Interior's actions after the district court's judgment have mooted this case.  Second, they argue that the district court's judgment became unreviewable on appeal after the government dropped its appeal.  We address these issues in turn.

With respect to mootness, appellees contend that Interior "abandon[ed] . . . its earlier decision" when it issued the 2018 decision.  Not so.  The 2018 decision, which addressed only whether the Tribe qualified under the first definition of Indian, specified that it did not "revisit or alter" the earlier 2015 decision's conclusion as to the second definition.  The cases

- 7 -

appellees advance in support of their argument are inapposite. They all involve agency actions that specifically rescinded and superseded a prior action.  See, e.g., Akiachak Native Cmty. v. U.S. Dep't of Interior, 827 F.3d 100, 113 (D.C. Cir. 2016) ("[O]nce the Department of Interior rescinded the Alaska exception, this case became moot.").  In this case, the agency specifically left its prior decision in place.[3]  The case is not moot.

Appellees also urge that we lack appellate jurisdiction to decide this case.  They argue that, in general, orders remanding an issue to an agency are not immediately appealable except by the agency.  As a result, they reason, the government's decision to dismiss its appeal stripped this court of jurisdiction over this appeal.  The Tribe replies that this rule is not an absolute rule and, on the facts of this case, permits its appeal.

This court has jurisdiction over "final decisions of the district courts of the United States."  28 U.S.C. § 1291.  The final decision rule "precludes 'piecemeal, prejudgment appeals' that would 'undermin[e] efficient judicial administration and encroac[h] upon the prerogatives of district court judges.'"

---

[3]     Nor does this appeal meet the normal criteria for mootness.  A case becomes "moot when the court cannot give any effectual relief to the potentially prevailing party." Town of Portsmouth v. Lewis, 813 F.3d 54, 58 (1st Cir. 2016) (quoting Am. Civil Liberties Union of Mass. v. U.S. Conference of Catholic Bishops, 705 F.3d 44, 52 (1st Cir. 2013)).  Here, were we to reverse the district court's judgment, the Tribe would receive the benefit of the BIA's 2015 decision to take the land into trust.

Ritzen Grp., Inc. v. Jackson Masonry, LLC, No. 18-938, 2020 WL
201023, at *2 (U.S. Jan. 14, 2020) (alterations in original)
(quoting Bullard v. Blue Hills Bank, 575 U.S. 496, 501 (2015)).
To effectuate that purpose, "the requirement of finality is to be
given a 'practical rather than a technical construction.'" Eisen
v. Carlisle & Jacquelin, 417 U.S. 156, 171 (1974) (quoting Cohen
v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546 (1949)).

      The cases appellees cite for the principle that only the
government may appeal a remand order, again, are inapposite, and
do not mean that the government's decision to dismiss its appeal
here destroys our jurisdiction. Those cases reason that, on the
facts presented there, the government agency may resolve the
underlying issue on remand, thus rendering a decision non-final
for purposes of appellate judicial review. See, e.g., Sierra Club
v. U.S. Dep't of Agric., 716 F.3d 653, 656 (D.C. Cir. 2013) ("This
rule promotes judicial economy and efficiency by avoiding the
inconvenience and cost of two appeals: one from the remand order
and one from a later district court decision reviewing the
proceedings on remand.").

      Even as to this "rule," this court has recognized that,
consistent with the rule's theoretical underpinning, "[e]xceptions
have been recognized in some cases, . . . and [judicial] appeals
have been allowed from orders remanding to an administrative agency

for further proceedings," often based on efficiency concerns.  Mall
Props., Inc. v. Marsh, 841 F.2d 440, 441-42 (1st Cir. 1988).

In Mall Properties, unlike here, the United States was
appellee, not appellant, and had filed a motion to dismiss the
appeal brought by another, arguing as grounds for dismissal that
the district court's remand order was not an appealable final
order.  Id. at 440.  This court dismissed the appeal, finding that
its "allowance . . . would violate the efficiency concerns behind
the policy against piecemeal appeals" because, on remand, the
agency could reach the same result "on independent proper grounds."
Id. at 443.  In this case, unlike in Mall Properties, the
government was appellant along with the Tribe as to the district
court judgment, but ultimately voluntarily dismissed that appeal.
The government has not at any point argued, as it did in Mall
Properties, that the remand order could not be appealed.  Indeed,
it gave no reason at all for its voluntary dismissal.

In this case, there is both real and practical finality,
and it would be contrary to judicial efficiency to dismiss this
appeal.  The Ninth Circuit has held that "[a] remand order is final
where (1) the district court conclusively resolves a separable
legal issue, (2) the remand order forces the agency to apply a
potentially erroneous rule which may result in a wasted proceeding,
and (3) review would, as a practical matter, be foreclosed if an
immediate appeal were unavailable."  Collord v. U.S. Dep't of

Interior, 154 F.3d 933, 935 (9th Cir. 1998) (citing Chugach Alaska
Corp. v. Lujan, 915 F.2d 454, 457 (9th Cir. 1990)).  Where these
"considerations," which are not "strict prerequisites," are met,
the district court's merits decision on which its remand order was
based has the necessary "practical finality" to be appealed.
Sierra Forest Legacy v. Sherman, 646 F.3d 1161, 1175-76 (9th Cir.
2011) (finding appellate jurisdiction over a private party's
appeal of a remand order after the United States voluntarily
dismissed its appeal).  These cases support our finding of
jurisdiction here.

　　　　The first consideration identified by the Ninth Circuit
is clearly met in this case.  The district court conclusively
resolved a separable legal issue when it granted summary judgment
to the plaintiffs on their first cause of action, holding that the
BIA exceeded its authority by construing the second definition of
"Indian" as it did.  The second and third considerations are not
directly applicable here because the agency has already completed
its remand proceedings.  The outcome of the remand proceedings
shows that the district court's merits decision has the requisite
practical finality to be appealed.  The BIA's 2018 remand decision
addressed a different issue and respected the agency's 2015 finding
on the issue now before us.  The agency's 2018 decision also does
not implicate the legal questions about the second definition of
"Indian" that are the subject of this appeal.  The questions here

have been fully briefed to this court.  The challenge in D.C. to the agency's 2018 decision does not involve the issue before us.

There is no gain, and only potential loss, to judicial efficiency by dismissing this appeal.  There is both Article III jurisdiction and finality of the judgment being reviewed.  We have jurisdiction over this appeal, and turn to the merits.

III.

A.    The Plain Meaning of the Second Definition in IRA Section 19

In 2009, the Supreme Court held that the word "now" unambiguously limits the first definition to members of those tribes that were under federal jurisdiction when the IRA became law in 1934.  Carcieri, 555 U.S. at 391.  The Court did not address the second definition of Indian.  It is the proper construction of that second definition that is the issue now before us.

In its 2015 decision here granting the Tribe's fee-into-trust application, the BIA relied exclusively on the second definition of Indian, stating specifically that it did not consider whether the Tribe might qualify under the first definition.  The BIA construed the term "such" to refer only to the phrase "members of any recognized Indian tribe," a portion of the language set forth in the first definition, rather than to the complete antecedent "members of any recognized Indian tribe now under Federal jurisdiction."  Reasoning that the second definition's use of "such members" was ambiguous, the BIA determined that its own

- 12 -

interpretation was reasonable and was entitled to judicial deference.   See Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984).

The district court held the BIA's interpretation was error because the statute's plain meaning required that "such" be read to refer to the entire "any recognized Indian Tribe now under federal jurisdiction" (emphasis added).   Because the BIA had not determined that the Tribe was under federal jurisdiction in 1934, to meet the requirements of Carcieri, 555 U.S. at 391, the Tribe had not met the IRA's definition of Indian.   And that meant the land could not be taken in trust.

Like Carcieri itself, "[t]his case requires us to apply settled principles of statutory construction under which we must first determine whether the statutory text is plain and unambiguous." Id. at 387 (citing United States v. Gonzales, 520 U.S. 1, 4 (1997)).   "If it is, we must apply the statute according to its terms." Id.   We employ the same methodology to determine whether the text is plain and unambiguous as used in the Carcieri majority opinion.

"We begin with the ordinary meaning of the word '[such],'" as understood when the IRA was enacted." Id. at 388.   At that time, the adjective "such" limited the words it modified to those with characteristics just described.   See Such, Black's Law Dictionary (3d ed. 1933) (defining such as "[a]like, similar, of

- 13 -

that kind, of the like kind; 'such' represents the object as
already particularized in terms which are not mentioned, and is a
descriptive and relative word, referring to the last antecedent");
Such, Webster's New International Dictionary 2518 (2d ed. 1934)
(defining such as "[o]f this or that kind, character or measure;
of the sort or degree previously indicated or contextually implied"
and "[h]aving the quality already or just specified").

        The ordinary and normal reading of "such" here is that
it refers to the entire antecedent phrase.  Normal usage in the
English language would read the word "such" as referring to the
entire antecedent phrase.  See United States v. Ahlers, 305 F.3d
54, 61 (1st Cir. 2002) (finding the use of "such" to "plainly
refer[] back to" the entire antecedent phrase).  We add that the
antecedent phrase itself contains no natural breaks.  Nor does the
antecedent include a connector such as "or."

        Given these dictionary definitions, we look to whether
there is anything in the text of the statute which suggests that
the use of the descriptive "such" is ambiguous as to whether it
refers to the entire antecedent clause.  In our view, the word
"such" plainly refers to the words used in the entire prior
definition to limit the members included in the second definition
of Indian.  Nothing about the text suggests that the word "such"
refers to only a portion of the prior phrase.  Rather, the plain
meaning is that the "such members" referred to in the second

definition are limited in the same way as the "members" in the first definition, but with the addition of those members' "descendants . . . who were, on June 1, 1934, residing within the present boundaries of any Indian reservation." Thus, the second definition is not redundant of the first definition. It newly encompasses certain descendants of such members.

The Tribe's argument that the use of "such" here is ambiguous advances cases that found the use of "such" in certain contexts created ambiguity. There surely is no per se rule that the word "such" is always ambiguous as to the antecedent to which it refers. Nor can there be a rule that "such" is never ambiguous. Whether the word "such" creates ambiguity depends on context. Here, nothing about the context in which "such" is used creates ambiguity.

We reject the argument that our reading is precluded because it would create surplusage. The Tribe argues that our reading renders the second definition surplusage because, under our interpretation, it will never find practical application. See Nielsen v. Preap, 139 S. Ct. 954, 969 (2019) (no statutory provision "should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence" (quoting Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 174 (2012))). The Tribe argues that, because Indian tribes define their own membership, few if any non-

member descendants would ever seek IRA benefits and, at any rate, the record in this case contains no evidence of anyone who would be included in our interpretation of the second definition but not in the first definition.

This argument fails for several reasons.  First, it is plainly possible that someone, a descendant, could qualify under the second definition, as we interpret it, without being a tribal member.  Indeed, the regulatory history shows a recognition of exactly that possibility, as we discuss later.  The record does not establish whether such a scenario is likely, but that is not the test.  Regardless, whether likely or not, that cannot alter the plain meaning of the second definition.  Second, that many people might qualify under <u>both</u> definitions does not render the second definition surplusage as to some people.

Even if there were some redundancy, that would not alter the plain meaning.  The Supreme Court has recently reminded us that Congress sometimes builds redundancy into statutes:

> If one possible interpretation of a statute
> would cause some redundancy and another
> interpretation would avoid redundancy, that
> difference in the two interpretations can
> supply a clue as to the better interpretation
> of a statute.  But only a clue.  Sometimes the
> better overall reading of the statute contains
> some redundancy.

<u>Rimini St., Inc.</u> v. <u>Oracle USA, Inc.</u>, 139 S. Ct. 873, 881 (2019).
The second definition serves the role of providing that certain

unenrolled descendants of tribe members receive IRA benefits. This
is consistent with Commissioner Collier's 1936 recognition,
described below, that "[t]here will not be many applicants under
Class 2, because most persons in this category will themselves be
enrolled members of the tribe . . . and hence included under Class
1."

The cases advanced by the Tribe do not undercut our
conclusion. In Hogar Agua y Vida en el Desierto, Inc. v. Suarez-
Medina, 36 F.3d 177, 186 (1st Cir. 1994), this court noted the
possibility of "latent ambiguity in a statutory modifier like
'such.'" That case construed the Fair Housing Act's anti-
discrimination provisions, which do not apply to "any single-
family house sold or rented by an owner" where "such private
individual owner does not own more than three such single-family
houses at any one time." Id. at 179 (emphasis added) (quoting 42
U.S.C. § 3603(b)(1)). The owner there owned more than three
single-family houses but had not sold or rented more than three of
them. Id. at 180. This court construed "such" to refer only to
"any single-family house," not to "sold or rented by an owner."
Id. at 186. Since the statute banned discriminatory refusals to
sell or rent housing, if the entire antecedent phrase about houses
sold or rented applied, houses that an owner refused to rent or
sell would not count toward the requirement that the owner own
three single-family homes. Id. We further noted "authoritative

- 17 -

legislative history" that "contradict[ed]" the opposite conclusion. Id. Significantly, the antecedent phrase in Hogar was a compound phrase which used the word "or," unlike the antecedent phrase in this case. The word "or" does not appear in the antecedent phrase here.

The Tribe also argues that United States v. Krstic, 558 F.3d 1010 (9th Cir. 2009), supports its reading. That case dealt with a criminal statute that provided:

> Whoever knowingly forges, counterfeits, alters, or falsely makes any immigrant or nonimmigrant visa, permit, border crossing card, alien registration receipt card, or other document . . . or . . . possesses . . . any such visa, permit, border crossing card, alien registration receipt card, or other document . . . knowing it to be forged, counterfeited, altered, or falsely made, or to have been procured by means of any false claim or statement . . . [shall be punished].

18 U.S.C. § 1546(a) (emphasis added). Krstic, who was charged with obtaining an alien registration receipt card by making false statements, argued that the words "any such" referred to and incorporated the verbs in the first part of the statute. Krstic, 558 F.3d at 1012-13. On that reading, only possessing or obtaining a "forged, counterfeited, altered, or falsely made" document would violate the statute. Id. at 1013. The Ninth Circuit reasoned: "No bright-line rule governs this area of the English language. 'Such' can refer exclusively to preceding nouns and adjectives. It can also refer to surrounding verbs, adverbial phrases, or other

clauses. Context is typically determinative. Unfortunately, context does not help us here." Id. Ultimately, the court found that the two interpretations were equally reasonable and found against Krstic only by reference to legislative history, which made clear that legislators had not intended Krstic's reading. Id. at 1016-17. The court noted that, "with this section, Congress has achieved in a single 124-word sentence a level of confusion it usually takes pages to create," in part by including "several candidates" for the antecedent to which "such" might refer. Id. at 1013.

The Tribe argues that we should find ambiguity here for the same reasons that the Ninth Circuit found ambiguity in Krstic. But the text of the IRA does not present the same interpretive challenge as the text of the statute at issue in Krstic. Krstic's proposed reading of § 1546(a) would have had the clear effect of decriminalizing conduct intended to be proscribed, while rendering the statute's reference to "procure[ment] by means of any false claim or statement" applicable only to a document that was already forged. Id. at 1017. As the Ninth Circuit held, nothing in the statute's text or history supported the notion that Congress intended that result. Id. at 1016-17. By contrast, this text here does not allow "several candidates" for the possible meaning of "such," nor is there reason to think Congress intended the

antecedent language to which "such" refers to be read as the Tribe
would have it.

B.    Contemporaneous Understanding of the IRA

        The _Carcieri_ Court, after concluding that the statute's
plain meaning was unambiguous, then looked to contemporaneous
executive documents as confirmation of its interpretation.    _See_
_Carcieri_, 555 U.S. at 390-91.   To the extent that reference to
statutory history is permissible to demonstrate a statute's plain
meaning, we note that, in this case, one of the same documents
relied on by the _Carcieri_ Court is again at odds with the Tribe's
and the BIA's interpretation.

        On March 7, 1936, Commissioner of Indian Affairs John
Collier issued a circular to Indian superintendents that stated in
part:

> [I]f a person of Indian descent belongs to a
> recognized tribe which was under Federal
> jurisdiction on the date of the Act (Class 1)
> or is a descendant of such member residing on
> a reservation June 1, 1934, [sic] (Class 2),
> he is entitled to participate in the benefits
> of the Act . . . .
>            . . . .
>        There will not be many applicants
> under Class 2, because most persons in this
> category will themselves be enrolled members
> of the tribe . . . and hence included under
> Class 1.

The circular also described those eligible under the third
definition of Indian as "persons having one-half or more Indian
blood who are neither enrolled members of a tribe (Class 1) nor

unenrolled descendants of such members residing on a reservation June 1, 1934, [sic] (Class 2)."

Commissioner Collier's understanding that those eligible under the first and second definitions would substantially overlap in that not many applicants would prove eligibility under the second definition is consistent with our understanding of the second definition's plain meaning. Although Collier's interpretation in the circular is not entitled to deference because the statute's plain meaning is unambiguous, as in <u>Carcieri</u>, it confirms our interpretation.

C.  <u>Canons of Construction</u>

The Tribe offers other arguments in support of the BIA's interpretation based on the canons of statutory interpretation.[4] But these canons apply only in cases of textual ambiguity. And we have found no ambiguity.

Under the commands of the Supreme Court, a statute that "does not contain conflicting provisions or ambiguous language" does not "require a narrowing construction or application of any

---

[4]     The Tribe offers two canons of construction they argue support their interpretation: "the canon of construction that remedial statutes should be liberally construed" in favor of their remedial purpose, <u>Peyton</u> v. <u>Rowe</u>, 391 U.S. 54, 65 (1968), and the canon that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit," <u>Montana</u> v. <u>Blackfeet Tribe of Indians</u>, 471 U.S. 759, 766 (1985). The Tribe argues that, because the IRA is a remedial statute intended to benefit Indians, any ambiguity should be resolved in the Tribe's favor under these two canons.

other canon or interpretative tool." <u>Barnhart</u> v. <u>Sigmon Coal Co.</u>, 534 U.S. 438, 461 (2002). In particular, the Court has been clear that the Indian canon of construction "does not permit reliance on ambiguities that do not exist; nor does it permit disregard of the clearly expressed intent of Congress." <u>South Carolina</u> v. <u>Catawba Indian Tribe, Inc.</u>, 476 U.S. 498, 506 (1986). That is also the effect of <u>Carcieri</u>. Nor does the remedial statute canon allow us to "stretch" the statute's coverage "well beyond what the statutory text can naturally bear." <u>Fla. Dep't of Revenue</u> v. <u>Piccadilly Cafeterias, Inc.</u>, 554 U.S. 33, 51 (2008). Again, <u>Carcieri</u> precludes resort to these canons.

## IV.

Because the IRA unambiguously forecloses the BIA's interpretation of 25 U.S.C. § 5129, the Secretary lacked authority to take land into trust for the benefit of the Tribe. We affirm the judgment of the district court. No costs are awarded.